Barbara **BUFFINGTON, Individually and as Personal Representative of the Estate of James E. Buffington, deceased; David M. Buffington, Individually, Plaintiffs–Appellees,**

v.

**BALTIMORE COUNTY, MARYLAND, a body corporate and politic; Cornelius J. Behan, Individually and in his official capacity as Chief of Police; Donald Gaigalas, Individually and in his official capacity; Ronald L. Tucker, Individually and in his official capacity, Defendants–Appellants,**

**and**

**Daniel Yuska, Individually and in his official capacity; Joseph Gribbin, Individually and in his official capacity; L.S. Harvey, Individually and in his official capacity; Kenneth W. Kramer, Individually and in his official capacity; William L. Maeser, Individually and in his official capacity, Defendants.**

**In re John A. AUSTIN; James G. Beach, III, Appellants.**

Barbara **BUFFINGTON, Individually and as Personal Representative of the Estate of James E. Buffington, deceased; David M. Buffington, Individually, Plaintiffs–Appellees,**

v.

**BALTIMORE COUNTY, MARYLAND, a body corporate and politic; Cornelius J. Behan, Individually and in his official capacity as Chief of Police; Daniel Yuska, Individually and in his official capacity; Joseph Gribbin, Individually and in his official capacity; L.S. Harvey, Individually and in his official capacity; Donald Gaigalas, Individually**

and in his official capacity; Kenneth W. Kramer, Individually and in his official capacity; Ronald L. Tucker, Individually and in his official capacity; William L. Maeser, Individually and in his official capacity, Defendants.

Nos. 88–1161, 89–1021, 89–1040, 89–1054 and 89–1055.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 8, 1990.

Decided July 31, 1990.

As Amended Sept. 19, 1990.

Rehearing and Rehearing In Banc Denied Oct. 15, 1990.

Carter G. Phillips, Sidley & Austin, Washington, D.C.; Robert Belknap Green, Irwin, Kerr, Green, McDonald & Dexter, Baltimore, Md., argued (Mark D. Hobson, Kevin L. Kimball, Sidley & Austin, Washington, D.C., Charles M. Kerr, Irwin, Kerr, Green, McDonald & Dexter, Baltimore, Md., Arnold Jablon, County Atty., Michael J. Moran, Asst. County Atty., Thomas K. Farley, Asst. County Atty., Baltimore County Office of Law, Towson, Md., on brief), for appellants.

William Francis Gately, Daniel Warren Whitney, Sr., Semmes, Bowen & Semmes, Baltimore, Md., argued (Janet M. Truhe, Semes, Bowen & Semmes, Baltimore, Md., on brief), for plaintiffs-appellees.

Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

PHILLIPS, Circuit Judge:

Baltimore County, Baltimore County Chief of Police Cornelius Behan, and Baltimore County Police Officers Donald Gaigalas and Ronald Tucker appeal the district court's judgment for David and Barbara Buffington in the Buffingtons' action under 42 U.S.C. § 1983 and state law, asserting the defendants' liability for failing to prevent the Buffingtons' son's suicide while he was being held in a county jail. The appellants also challenge separate orders of the district court awarding attorneys' fees to the Buffingtons and imposing civil contempt sanctions on their trial counsel. We affirm the judgments against Tucker and Gaigalas, reverse the judgments against Behan and Baltimore County, vacate and remand the award of attorneys' fees and expenses, and vacate and remand the contempt sanctions.

I

At about 4:30 a.m. on March 19, 1987, David Buffington, Jr., was awakened by the sound of his father's car pulling out of the driveway of his parents' house, next door to his. Knowing that his younger brother, James Buffington, 24, was the only person home that night, and that James did not have a valid driver's license, David rushed next door and discovered a handwritten suicide note and guns missing from his father's gun closet, which had been forced open. David immediately called the police emergency line, then set off in search of his brother. Officer Lewis Harvey of the Wilkens precinct of the Baltimore County Police Department, responding to a broadcast over the police radio describing James as suicidal, went to David's house and met David's wife, Kathryn, who showed him the suicide note. Kathryn described James' history of emotional problems and drug and alcohol abuse, particularly as a teenager. These problems had led to a number of encounters with the Wilkens precinct police, and in fact Officer Harvey acknowledged to Kathryn that he knew of James' background. Acting Shift Lieutenant Joseph Gribbin soon arrived at the house and also read the note. Officer Harvey called the Wilkens station and advised that James was suicidal and armed.

The county police apprehended James at 5:47 a.m. When he was seized, James appeared to be intoxicated and had in his possession two rifles and three handguns, all loaded. At 6:25 a.m., Officer Harvey called Kathryn Buffington and informed her that James had been found and was being held at the Wilkens station in protective custody. He told her that James had said that he had not committed suicide "because he couldn't decide which gun to use." J.A. at 1112. David Buffington returned from his search minutes later and called Officer Harvey to confirm that James was being held and to remind him of James' history of emotional problems. David stressed his sense that James was at extreme risk of committing suicide. Officer Harvey stated that preparations were currently being made to take James to Greater

Baltimore Medical Center for an emergency psychiatric evaluation. On Officer Harvey's advice, David decided to press criminal charges against his brother in order to enable the police to hold James in custody in the event that the hospital would not take him on an emergency commitment basis. At the time he spoke to David, Officer Harvey had already prepared the paperwork for arrest and charging.

From the time he was first brought into the station, Buffington was handcuffed to a rail beside the booking desk in the receiving room of the police station so he could be observed by the desk officers. Several police officers testified at trial that it was standard practice to handcuff suicidal detainees to the rail by the booking desk rather than place them in the lockup, where they might be able, quietly and unnoticed, to hang themselves. *See, e.g.,* J.A. at 1160–63 (testimony of Officer Harvey). At approximately 6:15 a.m. that morning, Officers Donald Gaigalas and Ronald Tucker had taken over as desk officers, relieving Officers William Maeser and Patrick Kamberger from that post. Officer Gaigalas, at about 6:25 a.m., unhitched Buffington from the rail and took him to an isolation cell, without removing any of his clothing. Although there were numerous detainees in the male lockup, Gaigalas placed Buffington alone in the female lockup area, and made no provision to keep him under observation. At 7:15 a.m., Buffington was found, hanged from the cell's horizontal bars by a noose fashioned from his pants.

David and Barbara Buffington, as James' parents, and Barbara as James' personal representative, then brought this action alleging claims of constitutional violation under 42 U.S.C. § 1983, and pendent state claims under the wrongful death and survival statutes. Named as defendants were Baltimore County, Chief of Police Cornelius Behan, Sergeant Daniel Yuska, Corporal Joseph Gribbin, Captain Kenneth Kramer, and Officers Lewis Harvey, Donald Gaigalas, Ronald Tucker, and William Maeser.

There was conflicting evidence at trial about Buffington's emotional state while handcuffed to the rail and about how much the desk officers knew concerning Buffington's intention to commit suicide. Outgoing desk officer Kamberger testified that Buffington told him that he wanted to shoot himself, and Kamberger further stated that he passed this information on to Officer Tucker when Tucker and Gaigalas took over at the desk. J.A. at 1357–60. Tucker denied that Kamberger told him this. J.A. at 1391. Officer Gaigalas admitted that he knew Officer Harvey was preparing forms for Buffington's emergency commitment. J.A. at 1412. Though he later equivocated on the point, Gaigalas admitted in original testimony that he knew Buffington was suicidal before he took him to the cell. J.A. at 1407–08. Gaigalas also admitted that a prior deposition statement that he did not know that Buffington was suicidal and was being held for emergency psychiatric treatment had been "deliberately and knowingly false." J.A. at 1406.

At trial, the Buffingtons presented expert testimony about the County's deficiencies in suicide prevention at correctional facilities. Since 1977, there had been 57 suicide attempts in the County jails, twelve of which had been "successful." Although the County had adopted in 1984 one of the nationally recognized suicide prevention standards, known as "CALEA" (Commission on Accreditation for Law Enforcement Agencies), it did not have any written policies or regulations implementing the standards. As noted, however, the department's officers did operate under a "standing order" that suicidal detainees should remain handcuffed to the rail by the front desk. The evidence at trial also showed that County police officers received no training in identifying suicidal detainees and in preventing suicide attempts. J.A. at 1627. Dr. Joseph Rowan, one of the Buffingtons' experts on jail and lockup suicide prevention, testified that "I strongly feel that this is the worst case of handling of a suicide case that I have ever seen." J.A. at 1662–63.

After a first trial ended in mistrial, a second jury found Officers Tucker and Gaigalas liable under § 1983 for deliberate

indifference to Buffington's serious need for some measure of suicide prevention. The County, through its policymaker Chief Behan, and Behan himself were found liable under § 1983 on the theory that their failure to train county police officers in suicide prevention evidenced a deliberate indifference to the rights of suicidal detainees. The jury awarded a total of $185,000 in damages against the appellants.[1] Following denial of the defendants' motions for j.n.o.v. and alternatively for a new trial, the court awarded over $430,000 in attorneys' fees and costs to plaintiffs. The court also found that the defendants' attorneys' failure to produce some crucial witnesses' statements was a knowing concealment under Fed.R.Civ.P. 26(e)(2)(B), and held them in civil contempt, ordering them to pay the court almost $7,000 each.

These appeals followed.

By way of preview, in Part II we address all the appellants' challenges to the existence of any constitutional right for whose violation they could be found liable on the § 1983 claims. In Part III, we consider whether Officers Tucker and Gaigalas have raised a separate issue of their qualified immunity from § 1983 liability. Although the judgment against Tucker and Gaigalas is supported independently by the jury's finding of liability on the state law claims, Parts II and III are necessary because Tucker's and Gaigalas' liability under § 1983 has important ramifications for the award of attorneys' fees. In Parts IV and V, we address the judgments against the County and Chief Behan, respectively, on the § 1983 claims. Parts VI and VII discuss the County's and Behan's separate claims of state law immunity from the state law claims on which they were found liable. Part VIII sets out the facts relevant to the district court's award of attorneys' fees and expenses to the prevailing parties, the Buffingtons, and addresses that award. Finally, Part IX discusses the facts relevant to and reviews the district court's order holding the County's attorneys in civil contempt and imposing monetary sanctions on them.

## II

■ All the appellants challenge the primary judgments under 42 U.S.C. § 1983 on the ground that the asserted constitutional right to some measure of protection from suicide under these circumstances does not exist. Specifically, the appellants contend that the due process clause of the fourteenth amendment does not require the state to take any steps to prevent a person in its custody from committing suicide when the state has intervened not to enforce the criminal law, but at the request of family members to protect the person from causing harm to himself. We reject this argument.

For the proposition that Buffington had no substantive due process right to affirmative aid from the state, the appellants rely primarily on *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In *DeShaney*, the Supreme Court held that the substantive component of the fourteenth amendment's due process clause creates no affirmative obligation in the state to protect individuals from "private violence." *Id.* at 1004. The petitioners in *DeShaney* argued that it violated substantive due process for state social workers to fail to protect a child from physical abuse at the hands of his father when the workers knew of the abuse but "stood by and did nothing." *Id.* at 1007. The Court rejected the petitioners' contention, reasoning that, as a general matter, the due process clause is "not ... a guarantee of certain minimal levels of safety and security," *id.* at 1003; it is only after the state has taken custody of a person that the due process clause imposes certain affirmative obligations of care on the state. *Id.* at 1005; *see Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (eighth amendment, applicable to states through the fourteenth amendment's due process clause, re-

---

1. The jury did not award recovery on the Buffingtons' claims against the precinct captain and four other police officers and rejected the claim that the County, Behan, and the precinct captain, Kramer, had participated in a conspiracy to cover-up the investigation of the suicide.

quires state to provide adequate medical care to prisoners where failure to do so would amount to deliberate indifference to serious medical needs); *Youngberg v. Romeo,* 457 U.S. 307, 319, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982) (fourteenth amendment's due process clause requires state to provide involuntarily committed mental patients with "minimally adequate or reasonable training to ensure safety and freedom from undue restraint"); *Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (fourteenth amendment's due process clause requires state to provide medical care to injured suspects in police custody). Because the child in *DeShaney* was still in the custody of his natural father—in "the free world"—the state was under no affirmative obligation enforceable through the due process clause to protect him.

The appellants argue that under the rationale of *DeShaney,* there was no affirmative duty of care on the part of any state actor in this case because the intervention to protect Buffington was at the instance of private parties. This is a misreading of *DeShaney.* Distinguishing prior cases in which it had found affirmative constitutional duties of protection from the situation in *DeShaney,* the Court explained that in those earlier cases it was the fact of state *custody* that triggered at least some duty of care on the part of the state:

> [W]hen the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* 109 S.Ct. at 1005–06 (citations omitted). Nothing in the Court's rationale for finding that some affirmative duty arises once the state takes custody of an individual can be read to imply that the existence of the duty somehow turns on the reason for taking custody. Such duties have been found both where the state takes custody incident to enforcement of its criminal laws, *see*

*Estelle,* 429 U.S. 97, 97 S.Ct. 285, and *Revere,* 463 U.S. 239, 103 S.Ct. 2979, and where the custody serves civil, regulatory purposes, *see Youngberg,* 457 U.S. 307, 102 S.Ct. 2452. Nor do we read *DeShaney* or the other cases as implying that it is relevant to the existence of the duty whether a state or private actor brought the need for custody to the state's attention. *See Youngberg,* 457 U.S. at 309, 102 S.Ct. at 2454 (involuntarily committed mental patient's mother sought son's commitment because she was unable to care for him or control his violence). In short, we see no basis for adopting the categorical rule urged by appellants that the state owed no duty of care to Buffington under the circumstances of this case. We hold that the due process clause did impose an affirmative obligation on the state to provide some measure of care here.

That leads to the question of the nature of the duty owed. The district court instructed the jury that it could find the individual officers liable under 42 U.S.C. § 1983 for their deprivation of a constitutionally protected liberty interest if it found that they knew that Buffington was suicidal and in need of emergency intervention, but nonetheless acted with deliberate indifference in failing to take any steps to prevent the suicide. The court noted, however, that liability could not be premised on a finding that these officers failed to act on a speculative suicide risk—by not screening for suicidal tendencies or taking other preventive measures—if they had no knowledge that Buffington was suicidal. This instruction defined the duty in terms of the recognized duty of care owed to pretrial detainees, and we think this was proper.

■ The due process clause guarantees a pretrial detainee the right to adequate medical care at least where the state's failure to provide such care would amount to deliberate indifference to a serious medical need. *See Martin v. Gentile,* 849 F.2d 863, 871 (4th Cir.1988) (noting that the precise scope of the pretrial detainee's right to medical care is uncertain but is at least as great as a convicted prisoner's eighth amendment right under *Estelle v. Gamble*

to be free from "deliberate indifference" to "serious" medical needs). A serious psychological impairment can qualify as such a medical need. *See, e.g., Bowring v. Godwin,* 551 F.2d 44, 47–48 (4th Cir.1977); *Partridge v. Two Unknown Police Officers,* 791 F.2d 1182, 1187 (5th Cir.1986); *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990).

■] More narrowly, we have recently recognized that where police know that a pretrial detainee is on the verge of suicide, that psychological condition can constitute the kind of serious medical need to which state officials must, under the due process clause, not be deliberately indifferent. In *Belcher v. Oliver,* 898 F.2d 32 (4th Cir. 1990), we found no due process violation where a pretrial detainee hung himself with his belt after police officers placed him in a jail without removing his belt or shoes. Because the plaintiff in *Belcher* had presented "no objective evidence that [he] even had a serious need for such attention ... [to] suicidal tendencies," *id.* at 35, we held that he had not stated a claim for a violation of his substantive due process rights. In *Belcher,* we declined to impose on the police officers a duty to screen detainees for suicidal tendencies, but we did not imply that officers would have had no constitutional duty at all if they demonstrably knew or had reason to know that a suicide was imminent. Other courts of appeals have recognized this distinction and the viability of a claim for official indifference to known suicidal tendencies. *See Colburn v. Upper Darby Township,* 838 F.2d 663, 669 (3d Cir.1988) ("custodial officials cannot be placed in the position of guaranteeing that inmates will not commit suicide [but] if such officials know or should know of the particular vulnerability to suicide of an inmate," fourteenth amendment imposes duty not to act with "reckless indifference" to the risk); *Danese v. Asman,* 875 F.2d 1239, 1244 (6th Cir.1989) (no duty to screen pretrial detainee for suicidal tendencies, but "[t]he story might be different if the police were certain that [the detainee] would attempt suicide and just ignored it").

Whether or not the court's characterization of Buffington in the instruction as a "pretrial detainee" was strictly accurate— and we note that evidence that backup criminal charges were in place in the event Buffington could not be admitted to the hospital supports the court's characterization—it was not plain error for the court's instruction to describe the substantive due process protection he enjoyed as coextensive with that afforded a pretrial detainee. Put another way, the appellants have not suggested, and we cannot conceive of, any reason why the Constitution might forbid deliberate indifference to the serious medical needs of pretrial detainees but permit such indifference to the needs of one in custody pending emergency psychiatric care.

## III

■] We next consider a worrisome problem arising from the confused litigation position taken by the individual officers respecting their possible entitlement in any event to qualified immunity from the § 1983 claims. Part II of the appellants' brief mentions qualified immunity for the officer-defendants, but hinges the argument wholly on the lack of a constitutional violation—it does not assert that these defendants were entitled to qualified immunity because their conduct did not violate clearly established constitutional law of which a reasonable officer would have known. The full text of this argument states:

Absent a constitutionally secured right, which in turn may give rise to a duty, the State officer may assert and prevail upon the doctrine of qualified immunity. The absence of such a right precludes "contouring" of the right and it becomes impossible to argue that the State officer should have known of something which did not exist. Accordingly, this Court must reverse the judgment entered against Appellants Behan, Gaigalas, and Tucker.

Brief of Appellants at 16–17 (citations omitted). `Even under a generous reading of this argument, it does no more than assert

that these individual defendants were entitled to qualified immunity because, *on the merits*, there was no constitutional violation. While the appellants' reply brief might be read as raising a distinct issue of qualified immunity, we decline to give the appellants the benefit of such a liberal reading. *See* 9 J. Moore & B. Ward, *Moore's Federal Practice*, ¶ 228.02[2.–1] (1990) (appellant must raise all issues he wishes to be considered in his initial brief); *Mississippi River Corp. v. FTC*, 454 F.2d 1083, 1093 (8th Cir.1972) (error relied on should not be asserted for the first time in the reply brief).

We think this the proper disposition for at least two reasons. The Buffingtons understandably did not think that the individual defendants had raised the distinct contention that they were entitled to qualified immunity because their conduct did not violate clearly established constitutional law of which a reasonable officer would have known. Perceiving that the qualified immunity argument was simply a reformulation of these defendants' argument on the merits, the Buffingtons responded accordingly in Part II of their brief. The full text of that argument states: "Appellants next argue that '[a]bsent a constitutionally secured right, ... the state officer may assert and prevail upon the doctrine of qualified immunity.' Appellants, however, have failed to establish the absence of such a right. Thus there is no basis for asserting this defense." Brief of Appellees at 32. In other words, the Buffingtons justifiably interpreted the qualified immunity issue raised by these defendants as simply duplicative of the merits issue, and so addressed only the merits.

More generally, the appellants' presentation of the qualified immunity defense throughout this litigation has been a chronicle of confusion and misapprehension. In their first responsive pleading, a motion to dismiss or for summary judgment, the appellants as defendants asserted "[t]hat the individual Defendants are immune with respect to the claims presented in the within Complaint." J.A. at 116. In their supporting brief, they argued that the plaintiffs had not alleged a violation of a clearly

established constitutional right, because the defendants had no duty to screen for latent suicidal tendencies, as alleged. Finding that the plaintiffs had plainly alleged more than a failure to screen for latent tendencies, the court denied the motion in a memorandum and order. After denial of a motion to reconsider, the defendants sought an amendment to the court's interlocutory order to certify other questions for immediate appeal under 28 U.S.C. § 1292(b). Over a week after that motion was denied, and about a week before trial, the defendants noted an appeal from the denial of qualified immunity under 28 U.S.C. § 1291, *see Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and moved for a stay of the impending trial. The district judge denied that motion, and Judge Winter, in chambers, also denied a motion for stay directed to him. Both judges found that the defense of qualified immunity had not been raised, and Judge Winter opined further that in any event he thought the defense inapplicable. From all indications in the record, that appeal of the qualified immunity issue was thereafter abandoned and, on the first day of trial, the defendants filed an answer to the plaintiffs' amended complaint and finally included good faith qualified immunity as a defense distinct from the constitutional violation.

The first trial ended in a mistrial because of a hung jury. At the close of evidence in the second trial, the defendants moved for directed verdict. The court reserved its ruling on that motion and submitted the case to the jury. The defendants requested an instruction on qualified immunity, which the court refused to give for reasons not contained in the record. The defendants/appellants have not on appeal assigned error to that refusal. After the jury returned verdicts under § 1983 against some of the individual defendants, those defendants moved for j.n.o.v., asserting, *inter alia*, in the motion itself that they were entitled to qualified immunity. In their supporting brief, however, they made no argument whatsoever on this point and made no mention of the refusal

to instruct on qualified immunity. As with the refusal to give the qualified immunity instruction, the appellants have not on appeal assigned error to the denial of the motion for directed verdict or j.n.o.v.

In sum, we do not think the appellants have properly preserved and raised in this court an issue of qualified immunity distinct from the question of whether a constitutional violation occurred. We decline to consider such an issue *sua sponte*.

## IV

■] Appellant Baltimore County argues separately that it was entitled in any event to judgment as a matter of law on the § 1983 claim against it. Specifically, the County contends that the district court erred in submitting that claim to the jury because there was no evidence that its failure to train its officers in suicide prevention proximately caused Buffington's suicide. We agree that under the Supreme Court's decision in *City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the judgment against the County on the § 1983 claim must be reversed.

In *Canton*, the Supreme Court outlined the circumstances under which a municipality can be held liable under § 1983 for constitutional violations resulting from a policy of failing to train municipal employees. Under general principles of § 1983, a municipality can be liable only when the municipality itself, through one of its policies or customs, causes the constitutional violation; municipal liability cannot be premised on *respondeat superior* or vicarious liability. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 691–92, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978). Moreover, the municipal policy or custom must be the direct cause of—the "moving force" behind—the constitutional violation. *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d

509 (1981). The *Canton* Court, addressing the peculiar context of a claim that a municipality's policy of omission, *i.e.*, its failure to train, was the cause of the constitutional violation, considered both the degree of fault and the causal link required under § 1983 to sustain that type claim.

The Court held first that § 1983 requires a showing that the failure to train amounts to "deliberate indifference to the rights of persons with whom the police come in contact." [2] *Canton*, 109 S.Ct. at 1204. This degree of fault was thought necessary to reconcile the failure-to-train theory of liability, which alleges a policy of omission, with the principle that § 1983 municipal liability can attach only when the municipality's policy represents "a deliberate choice [by the municipality's authorized policymakers] to follow a course of action ... made from among various alternatives." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1300–01, 89 L.Ed.2d 452 (1986) (Brennan, J., plurality opinion). In addition to the "deliberate indifference" culpability standard, the Court explained that a direct causal link must exist between a specific deficiency in training and the particular violation alleged: "the identified deficiency in [a] training program must be closely related to the ultimate injury." *Canton*, 109 S.Ct. at 1206. The pertinent question on causation will be "Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id.* It will not

> suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual

---

**2.** This requirement of "deliberate indifference" arises under § 1983 itself and stands independent of any culpability requirement that may be necessary to prove the underlying constitutional violation. *Canton*, 109 S.Ct. at 1204 n. 8. This does not of course displace the firmly established rule that § 1983 contains no independent state-of-mind requirement governing the liability of the immediate wrongdoer. *See Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989).

and recurring situations with which they must deal.

*Id.*

We do not think the evidence was sufficient under *Canton* to permit a jury to find that a policy of failure to train officers in suicide prevention actually and proximately caused the particular harm that occurred here. Immediately before the suicide, Buffington was handcuffed to the rail by the precinct's booking desk, in conformance with the standard procedure used as a matter of policy for suicidal detainees at the precinct. Buffington would have remained handcuffed there until moved to the hospital but for desk officer Gaigalas's decision, unchecked by his fellow desk officer Tucker, to take him to an isolation cell without removing any of his clothing, arranging for monitoring, or taking some other preventive measure. It may well be, as the Buffingtons contend, that better suicide prevention training, closer adherence to national standards on jail suicide prevention, written regulations, or some combination of these would have served to avoid what occurred here. But *Canton* has made clear that municipal liability under § 1983 may not rest on such proof. *Id.* 109 S.Ct. at 1206. This particular injury would have been avoided by the individual desk officers taking the minimal preventive step of following the precinct's official policy and customary practice of keeping Buffington handcuffed to the rail, *i.e.*, by showing more than the deliberate indifference that the jury found.[3] In so holding, we need not determine whether the Wilkens precinct's standards and procedures for handling suicidal detainees necessarily met constitutional standards in all possible respects. Rather, in light of *Canton*'s instruction on causation, we hold only that the normal practice of handcuffing such detainees to the rail, which was a part of those procedures, was "sufficient to equip

[Gaigalas and Tucker] to avoid the particular injury causing conduct" in this case. *Canton*, 109 S.Ct. at 1206; *see Dorman v. District of Columbia*, 888 F.2d 159 (D.C. Cir.1989) (reversing § 1983 judgment against District of Columbia for failure to train in suicide prevention on grounds that *Canton*'s fault and causation standards were not met).

### V

■ The judgment against Chief Behan under § 1983 must also be reversed. Behan may not be held liable for § 1983 violations for the acts of Officers Gaigalas and Tucker under a theory of *respondeat superior*. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *Vinnedge v. Gibbs*, 550 F.2d 926 (4th Cir.1977). Here, the theory of Behan's individual liability alleged and submitted to the jury was that he had authority for implementing training or other suicide prevention standards and failed to do so, directly and proximately causing Buffington's suicide. For the reasons stated in the preceding section, there was insufficient evidence that any failure to train on Behan's part caused this particular injury.

### VI

■ The County next contends that the district court erred in holding it liable for the state law negligence claims for wrongful death and survival because Baltimore County has never waived its governmental immunity. The district court denied the County's motion for j.n.o.v. on this ground, reasoning that the County's creation of a self-insurance fund constituted a limited waiver of governmental immunity. We agree with the County that its adoption of a self-insurance fund did not operate to waive the County's governmental immunity

---

**3.** Indeed, the district court has held and the Buffingtons themselves, in their appellate brief, have acknowledged that it was Gaigalas's critical dereliction that directly caused this suicide. The court stated that it was not "necessary for the police officers at Wilkens Police Station to obtain a Ph.D. in order to refrain from placing a known suicidal person in an isolated jail cell

with his pants on. A semi-clear head and a normal degree of common sense would have sufficed." J.A. at 964–65. Similarly, the Buffingtons' statement of facts notes that "[t]his suicide was the direct, proximate, and inevitable result of the utter failure of Gaigalas and Tucker to constantly observe James while he was in their custody." Brief of Appellees at 10.

and that the judgment against it on the state claims must therefore be reversed.

As a "home rule" county chartered under Article XI–A, § 2, of the Maryland Constitution, Baltimore County may exercise only the powers granted to such counties in the Express Powers Act, Md.Ann. Code Art. 25A (1987).[4] One such express power the County possessed at the time relevant to this case was the power to waive its governmental immunity.[5] In 1977, the County created a self-insurance fund designed, among other things, "to pay on behalf of the county [and its employees] ... any sum which the county [and its employees] may become legally obligated to pay for liability claims, including but not limited to personal injury and/or property damage." Baltimore County Code, § 2–131(b). The question is whether Maryland law would view this legislative action as a waiver of the County's governmental immunity.

Under Maryland law, a court may find a waiver of sovereign or governmental immunity only in "positive consent given, or by necessary or compelling implication." *Jackson v. Housing Opportunities Comm'n*, 289 Md. 118, 422 A.2d 376, 378 (1980).[6] Maryland uses a two-pronged test for determining whether the relevant legislature, be it the state's General Assembly or a county governing body, has waived sovereign or governmental immunity: "[a]n asserted waiver of immunity is ineffective 'unless specific legislative authority to sue the agency [or municipality] has

been given, and unless there are funds available for the satisfaction of the judgment, or power reposed in the agency [or municipality] for the raising of funds necessary to satisfy a recovery against it.'" *Jackson*, 422 A.2d at 378–79 (quoting *Katz v. Washington Suburban Sanitary Comm'n*, 284 Md. 503, 397 A.2d 1027, 1033 (1979)). Both prongs of this test must be satisfied. *Id.* 422 A.2d at 378–80. The general rule in Maryland is that the mere procurement of liability or indemnity insurance by a governmental unit has no effect on its immunity from tort liability. *See id.* at 380; *Quecedo v. Montgomery County*, 264 Md. 590, 287 A.2d 257, 260 (1972); *Jones v. Scofield Bros.*, 73 F.Supp. 395, 398 (D.Md.1947).

The first prong of the waiver test is not met in this case, because the County has never consented to be sued. The provision for self-insurance cannot by itself support a finding of such consent. *Jackson*, 422 A.2d at 380. In the Maryland cases where waiver has been found, the legislative intent that a county or a state agency may be sued has been expressed in explicit and unmistakable language. *See, e.g., James v. Prince George's County*, 288 Md. 315, 418 A.2d 1173 (1980) (tracking language of Express Powers Act, county's charter provided "[t]he County may be sued in actions sounding in tort in the same manner and to the same extent that any private person may be sued"); *Katz v. Washington Suburban Sanitary Comm'n*, 284 Md. 503, 397 A.2d 1027 (1979) (state agency "shall

---

4. Md. Const. art. XI–A, § 2 (1981), provides: "The General Assembly shall by public general law provide a grant of express powers for such County or Counties as may thereafter form a charter under the provisions of this Article." Pursuant to this mandate, the General Assembly enacted the Express Powers Act.

5. Section 5(CC) of the Express Powers Act authorized a charter county

[t]o provide by ordinance or inclusion in the county charter for the waiver of sovereign immunity so that the county may be sued in tort actions in the same manner and to the same extent that any private person may be sued. Any chartered county [that so provides] shall carry comprehensive liability insurance to protect itself, its agents and its employees.

Md.Ann.Code Art. 25A, § 5(CC) (1987). The General Assembly has now repealed this subsection and all waivers enacted under it. Acts 1987, ch. 594, § 2. This repeal, however, is irrelevant to the waiver issue here, because the repeal applies only to actions arising on or before July 1, 1987. *Id.* § 3.

6. Though the Maryland cases have frequently used the terms interchangeably, "sovereign" immunity refers to the tort immunity of the State and its agencies, which is total, while "governmental" immunity refers to the immunity of counties and municipalities, which turns on whether the suit is based on "governmental" or "proprietary" functions; tort immunity exists, unless waived, in the former case, but not in the latter.

be a body corporate ... with the right ... to sue and be sued"); *cf. O & B, Inc. v. Maryland–Nat'l Capital Park and Planning Comm'n*, 279 Md. 459, 369 A.2d 553 (1977) (legislative authorization that state agency may "sue and be sued" is not alone sufficient to find waiver of sovereign immunity). Nowhere in the language of § 2–131 has Baltimore County expressly authorized that suits may be brought against it, and the creation of the self-insurance fund cannot take the place of the necessary legislative authorization.

The district court believed that a county would not create an insurance fund to pay claims for which it might become liable unless it intended thereby to waive its immunity from all claims. This analysis is flawed in at least two respects. First, the district court, quoting *Jackson*, 422 A.2d at 382, stated that "a legislative mandate to carry liability insurance is a strong indication of legislative intent that sovereign immunity is waived to the extent of the insurance." On that basis, the court found that the County had effected "a limited waiver of sovereign immunity." [7] This reasoning, however, ignored the context of the Court of Appeals' statement in *Jackson*. In that case, the court had already concluded that the first prong of the immunity waiver test was satisfied by language in Md.Ann.Code Art. 44A, § 8(a) stating that the housing authority has power "[t]o sue and be sued." *Id.* 422 A.2d at 379. The quoted language from *Jackson* was stated in the context of considering whether, notwithstanding the express provision for suits, the particular insurance provision in that case sufficed under the second prong of the waiver inquiry. *Id.* at 381–82.

Second, the district court's premise that a county would not insure itself unless it had waived its governmental immunity re-flects a misapprehension of the nature of the county's pre-existing immunity. Though counties in Maryland are immune, absent waiver, from suits based on actions taken in the exercise of their "governmental" functions, they are not immune from suits alleging conduct in the exercise of "proprietary" functions.[8] *Austin v. City of Baltimore*, 286 Md. 51, 405 A.2d 255, 256 (1979). It would certainly be permissible to infer that the County's creation of the self-insurance fund was motivated by a need to fund liabilities arising from suits based on "proprietary" functions. This inference is supported by the fact that the County enacted § 2–131 under the express power conferred by Md.Ann.Code Art. 25A, § 5(S) (1987), which permits amendment of the county charter, rather than under the now-repealed express power in § 5(CC) to waive immunity. In short, apart from its failure to meet the first prong of the immunity test, the provision for the insurance fund, viewed in context, contains no necessary or compelling implication of waiver of governmental immunity.

We hold that Baltimore County was immune from the state law claims alleged in this case and that the judgment against it on those claims must be reversed.

### VII

■ We also agree with Police Chief Behan that the judgment against him on the state law claims for wrongful death and survival must be reversed. The district court erred in denying his motion for directed verdict or j.n.o.v., made on the ground that Maryland law provided him with public official immunity from the state law claims.

A government official in Maryland is entitled to public official immunity if "(1) the individual actor, whose alleged negligent

---

**7.** If the district court had been correct that the waiver of immunity accomplished by this enactment was "limited," the waiver would have violated the Express Powers Act. A chartered county's waiver of governmental immunity under that Act is ineffective if "limited." *See Prince George's County v. Fitzhugh*, 308 Md. 384, 519 A.2d 1285 (1987).

**8.** The Buffingtons have not argued that the County's conduct in this case could qualify as a "proprietary" function, and we express no opinion on the proper characterization. *See Austin*, 405 A.2d at 272 (distinction between "governmental" and "proprietary" functions "is probably one of the most unsatisfactory known to the law" (quoting 3 K. Davis, Administrative Law Treatise, § 25.07, at 460 (1958))).

conduct is at issue, is a *public official* rather than a *mere government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties." *James v. Prince George's County,* 288 Md. 315, 418 A.2d 1173, 1178 (1980) (emphasis in original). It is not contested that Behan qualifies as a "public official" under the first prong of the test. *See Duncan v. Koustenis,* 260 Md. 98, 271 A.2d 547 (1970) (among the factors to considered are whether the individual has ongoing responsibilities, performs an important public duty, and exercises some portion of the government's sovereign power). Rather, the parties disagree over whether the acts subjecting Behan to state law liability were "discretionary" or "ministerial."

The Buffingtons' state law claims against Behan alleged, *inter alia,* that his negligent failure to train, supervise, or otherwise guide the conduct of individual police officers in their handling of suicidal detainees caused James Buffington's suicide. Implicit in this allegation, and in the related allegation that Behan was a policymaker for the purposes of imposing § 1983 liability on the County through him, is the recognition that Behan had discretion to implement more effective suicide prevention standards than he did.[9] It is precisely his failure to exercise available discretion that forms the basis of the state law claims against him. This type of failure, however, is the prototypical "discretionary" choice of a policymaking public official that the state law immunity protects. *See Restatement (Second) of Torts* § 895D comment f (1979).

The Buffingtons contend, consistent with the district court's analysis, that because Chief Behan had adopted, at least nominally, the CALEA national standards for jail suicide prevention, his duty to see these standards rigidly maintained involved performance of only a ministerial duty. While it is certainly true that discretion means only the "'freedom to act according to one's judgment in the absence of a hard and fast rule,'" *James,* 418 A.2d at 1179 (quoting *Schneider v. Hawkins,* 179 Md. 21, 16 A.2d 861, 864 (1940)), the CALEA standards did not have the force of law in Baltimore County and were not binding on Behan's discretion to shape department policy on suicide prevention; indeed, the Buffingtons specifically complain about the *lack* of any written regulations governing suicide prevention. As the official who adopted the CALEA standards, Behan would presumably have had the discretion to modify or even abandon them, at peril, as always, of liability for any resulting violations of federal constitutional rights. As Behan's state law liability was founded on discretionary acts, the judgment against him on the state law claims is reversed.

## VIII

The appellants also challenge a separate order of the district court awarding the prevailing plaintiffs $430,658.78 in attorneys' fees and costs under 42 U.S.C. § 1988.[10] Because we have altered the disposition of some of the § 1983 claims, we must remand the award of fees and costs to the district court for reconsideration in light of the Buffingtons' now more limited success. *See Lenard v. Argento,* 699 F.2d 874, 898 (7th Cir.1983). We think it appropriate, however, to discuss some of appellants' specific challenges to the award as it came to us, and some principles of § 1988 fee awards applicable in the present posture of this case, to guide the district court's exercise of discretion on remand. *See id.; Muscare v. Quinn,* 680 F.2d 42 (7th Cir.1982).

## A

In their unsupplemented motion for attorneys' fees, the plaintiffs requested that

---

9. Throughout their appellate brief, the Buffingtons acknowledge the breadth of Behan's authority as the police department's policymaker. *See, e.g.,* Brief of Appellees at 15 n. 8 ("Chief Behan has the final say in determining the rules and regulations of the department.").

10. Title 42 U.S.C. § 1988 provides, in relevant part: "In any action or proceeding to enforce a provision of section ... 1983 ... of this title, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

the "lodestar"[11] calculation of the fees for their lawyers—members of the Baltimore firm of Semmes Bowen & Semmes—and two paralegals be made as follows: for lead counsel and senior partner William Gately, 893.7 hours at an hourly rate of $175; for partner Daniel Whitney, 1,150.6 hours at an hourly rate of $135; for associate Janet Truhe, 281.5 hours at an hourly rate of $120; for associate Denise Grieg, 36 hours at an hourly rate of $70; and for paralegals Nancy Kozak and Amy Dagold, 202.4 and 2.6 hours, respectively, both at an hourly rate of $58. The total fee requested under this calculation was $359,918.50. The district court modified this request in only a few minor respects. Though the court rejected challenges to the hourly rates submitted for Gately and Whitney and the paralegals (the rates for Truhe and Grieg were not challenged), it reduced the hours expended. First, it noted 26 billing entries, totalling 4.55 hours, designated "Telephone conversation with judge or judge's staff." The court noted that these conversations were probably with the chambers law clerk, and because, it reasoned, that clerk would not have spoken more than six minutes at any one time, each of the 26 entries should have been for no more than 0.1 hours. The court thus reduced those 4.55 hours to 2.6. J.A. at 936–37. The court also noted that certain of the interrogatories were substantially similar, "which raise[d] the spectre of duplicity [sic]," J.A. at 939, and accordingly reduced the 14.65 hours spent on them to 8. Finally, the court was troubled by the numerous billing entries generically describing the billed time, e.g., "legal research regarding substantive issue." Though admitting that the billing sheets gave the court no basis for evaluating the reasonableness of a very substantial portion of the requested hours, it found that "almost all of what counsel did was reasonable" because they "left no stone unturned in proving [the] case and in providing the

Court with pertinent authority." J.A. at 944. Nonetheless, the court followed the approach used in *Spell v. McDaniel*, 616 F.Supp. 1069 (E.D.N.C.1985), *aff'd in part, vacated in part*, 824 F.2d 1380 (4th Cir. 1987), and made an "across-the-board" 5% reduction in the hours expended on the ground of inadequate documentation. After these modest reductions, the court awarded $340,739.60 of the $359,918.50 sought in this unsupplemented petition. The court also approved all of the $71,513.70 sought as expenses, $39,470.68 of which was spent on four expert witnesses.

The court dealt separately with a supplement to the motion for attorneys' fees covering fees and expenses incurred after the submission of the initial motion. This supplement requested an additional $20,383.48 for work in connection with the response to defendants' motion for j.n.o.v. and the preparation of the fee petition. At the same hourly rates, the court approved Gately's requested 30 hours, but reduced Whitney's 58.6 by 10 hours, Truhe's 47.5 by 5% (to 42.75 hours), and paralegal Kozak's 3.3 to 2.3 hours. The resulting reply fee awarded was $17,074.40. The court did not alter the $1,331.08 requested for "reply expenses" of copying, use of Westlaw and Lexis, and word processor time. The total award, after supplementation, of $430,658.78 thus comprised $357,814.00 for attorneys' fees and $72,844.78 for expenses.

### B

■ The most significant issue the district court will have to consider on remand is whether the now unsuccessful claims against Chief Behan and Baltimore County were sufficiently unrelated to those against the individual officers that the hours expended in pursuit of the former claims must be excluded in the fee award calculation. *See Hensley v. Eckerhart*, 461 U.S. 424, 434–35, 103 S.Ct. 1933, 1939–40, 76

---

11. The "lodestar" figure represents "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). This figure will normally represent the reasonable fee con-

templated by § 1988, though in cases of "exceptional success" an upward adjustment may be appropriate, or in cases of partial or limited success some reduction may be in order. *Id.* at 435, 103 S.Ct. at 1940.

L.Ed.2d 40 (1983). In *Hensley*, the Supreme Court admonished district courts that where a plaintiff brings in a single lawsuit "distinctly different claims that are based on different facts and legal theories," work on unsuccessful claims cannot be thought to have contributed to the ultimate result and must be excluded from the fee award. *Id.* As discussed, the successful claims against the two individual police officers involved allegations of deliberate indifference to a particular, known, serious need for psychiatric care, and focused exclusively on the officers' conduct at the booking desk in the early morning of March 19, 1987. The ultimately unsuccessful claims against Chief Behan and the County, on the other hand, rested on what appears to us to have been altogether separate conduct—that of failing, over a number of years, to train police officers and equip the Wilkens precinct to handle the recurring problem of suicidal detainees. In other words, the legal theories of a county's custom and policy of indifference to suicidal detainees and the facts needed to prove them might arguably be thought formally unrelated to the facts and theories on which Gaigalas and Tucker were held liable. Nonetheless, we decline to make a first instance assessment of the relatedness of these claims, in light of the Supreme Court's direction that the calculation of a fee award, including questions of the relatedness of multiple claims, lies primarily within the district court's equitable discretion. *Id.* at 436–37, 103 S.Ct. at 1941–42. If the district court determines that the unsuccessful claims against Chief Behan and the County were indeed unrelated to the successful ones, the burden of showing which hours are recoverable for work on the successful claims will of course rest with the fee applicant, and the court is entitled to expect that the applicant's time records will provide some guidance in identifying the recoverable hours. *Id.* at 437, 103 S.Ct. at 1941 (plaintiff's counsel "should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims.").[12]

In the event that the district court decides that the unsuccessful claims are "inextricably intermingled" with the successful ones, *see Plyler v. Evatt*, 902 F.2d 273, 280 (4th Cir.1990), the court should undertake a renewed assessment of the "significance of the overall relief obtained ... in relation to the hours reasonably expended on the litigation." *Hensley*, 461 U.S. at 435, 103 S.Ct. at 1940. Although the court earlier found that the plaintiffs were entitled to a fully compensatory fee because their attorneys achieved an excellent result, this conclusion rested substantially on

---

12. The appellants object on various grounds to the award of expenses for some of the plaintiffs' expert witnesses. If the district court determines on remand that the claims against Behan and the County were distinct from the successful ones, it should give careful consideration to which, if any, of these experts' expenses should be awarded.

In this connection, we note that the testimony of two of the experts, Joseph Rowan and George Kirkham, appears to have related exclusively to the unsuccessful theory that the police chief's and County's failure to maintain suicide prevention standards was the deliberate indifference that caused the suicide. A third reimbursed expert, Lindsay Hayes, never testified but advised the plaintiffs on the same subject matter. The fourth expert, Robert DiGrazia, a veteran in the field of police administration, testified to the deficiencies in the police's internal "command" investigation of Buffington's suicide. His testimony therefore related to the conspiracy/cover-up theory on which the plaintiffs did not prevail at trial. The district court, however, rejected the argument that those particular unsuccessful claims were wholly distinct from the others against the County and Behan and accordingly refused to exclude attorneys' fees and expenses relating to them. Our disposition of the claims against the County and Behan will obviously necessitate reconsideration of the award for DiGrazia's expenses, which related to unsuccessful claims previously found to be intertwined with the now unsuccessful custom and policy claims against the County.

Though the district court should reconsider the relatedness of the claims and the award of expert fees, it need not revisit the argument, correctly rejected by the court and renewed by appellants here, that fees and expenses attributable to the first trial, which ended in mistrial, should be excluded on the ground that the plaintiffs did not prevail in that proceeding. Section 1988 rewards a plaintiff who ultimately prevails—who wins the war—without deducting for lost battles along the way. *See Spell v. McDaniel I*, 824 F.2d 1380 (4th Cir.1987) (approving lodestar that included hours spent on the first trial, even though second trial on damages was granted).

the judgment that "two of the defendants who lost—Chief Behan and Baltimore County—were the most important." J.A. at 943. We anticipate that, if the court does not determine that the claims against Behan and the County were distinctly different, its assessment of the ultimate result of the litigation will nonetheless be substantially affected by our disposition of those claims. We doubt that, in these changed circumstances, a fully compensatory award would be appropriate, but as with the preliminary question of the relatedness of the claims, the district court should make the judgment on that question in the first instance, with close attention to "the relationship between the amount of the fee awarded and the results obtained," *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941, and the need for a "clear explanation" of that relationship as perceived by the court, *id.*

C

The appellants have also challenged the hourly rates awarded the two lawyers who served as the Buffingtons' lead counsel, David Gately and Daniel Whitney. In the course of reconsidering the fee award on remand, the district court should revisit this challenge, with due regard for the following observations.

As part of his broad oversight of the case, Gately developed the plaintiffs' strategy and tactics, took numerous depositions, and examined most of the witnesses at trial. Whitney was primarily responsible for pleadings, papers, and legal research, but also handled the presentation of the plaintiffs' expert witnesses and developed the claims against the County and its policymakers. As noted, the court set the hourly rates for Gately and Whitney at $175 and $135 per hour, respectively. Both men were partners in the prominent Baltimore law firm of Semmes Bowen & Semmes and had extensive litigation experience, but no experience in civil rights litigation, apparently having become involved in this case because David Buffington, James' father, was also a partner in that law firm.

The district court should reconsider whether the hourly rates for these attorneys comport with the underlying purpose of the Civil Rights Attorney's Fees Awards Act of 1976, which was to establish a fee-shifting regime that would enable civil rights plaintiffs to gain effective access to the federal courts. *See Pennsylvania v. Delaware Valley Citizens' Council*, 483 U.S. 711, 731 n. 12, 107 S.Ct. 3078, 3089 n. 12, 97 L.Ed.2d 585 (" '[A]n attorney's fee award should be only as large as necessary to attract competent counsel' ") (quoting *Lewis v. Coughlin*, 801 F.2d 570, 576 (2d Cir.1986)). Without implying any impropriety, we think it a relevant inquiry whether but for the unusual circumstance that found the decedent's father a partner in this law firm, these particular lawyers of undoubtedly great general competence would have been retained to handle this action, given their inexperience in the complexities of § 1983 litigation. While there is affidavit evidence that Gately's and Whitney's hourly rates were in line with market rates charged private clients for complex civil litigation in the Baltimore community, the affidavits do not provide specific information about market rates in Baltimore for comparable civil rights cases. *See Perkins v. Mobile Housing Bd.*, 847 F.2d 735, 737 (11th Cir.1988) (noting that the "market rate for federal civil litigation is too over-inclusive" for setting hourly rates under § 1988). We are unable to tell from the district court's memorandum opinion whether the hourly rates for Gately and Whitney were influenced by the fact that, as partners in a leading local firm, they customarily billed at the high end of the private market rates; such a factor would be impermissible under the Supreme Court's direction in *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984), that private firms and nonprofit legal service organizations should be treated equally in setting hourly rates under § 1988. *See Norman v. Housing Authority*, 836 F.2d 1292, 1305 (11th Cir. 1988) ("While it is no doubt true that law firms of established lineage and reputation can charge substantial fees, that is not really the question."); *Daggett v. Kimmel-*

*man,* 811 F.2d 793, 799 (3d Cir.1987) ("there ... comes a point where a lawyer's historic rate, which private clients are willing to pay, cannot be imposed on his or her adversaries.").

 Here, the district court accepted as reasonable under § 1988 the proffered rates that these two skilled attorneys charged in other civil litigation matters. These rates should not have been mechanically accepted in the absence of more specific corroborating evidence of rates charged for civil rights litigation in the Baltimore community. *See Shakopee Mdewakanton Sioux v. City of Prior Lake,* 771 F.2d 1153, 1161 (8th Cir.1985) (an attorney's own billing rate is not a reliable measure where he does not specialize in the area of law that is the subject matter of the lawsuit). In *Spell v. McDaniel I,* 824 F.2d 1380, 1402 (4th Cir.1987), we noted that hourly rates could be proved by "affidavits reciting the precise fees that counsel with similar qualifications have received in comparable cases; information concerning recent fee awards by courts in comparable cases; and specific evidence of counsel's actual billing practice or other evidence of the actual rates which counsel can command in the market." We did not imply, however, that the rates charged by a private attorney without civil rights experience could be determinative of a § 1988 hourly rate without some other evidence corroborating those rates as reasonable for § 1983 litigation in the relevant community. The Supreme Court has strongly intimated that the primary justification for awarding high-end hourly rates for experienced counsel in § 1983 litigation is that their very experience and skill will result in economies of time because of their lack of need for extensive background legal re-

search. *Blum,* 465 U.S. at 898, 104 S.Ct. at 1548. Where, as here, counsel is indeed experienced in general but not in the special field of civil rights litigation, that justification may upon careful analysis be found lacking. Here as a matter of fact the record at least suggests the likelihood that an inordinate amount of legal research effort was necessitated by these undoubtedly fine lawyers' lack of specific experience in this field.[13]

In conclusion of this issue, we reiterate that we are mindful of the necessity of—and sound policy reasons for—according substantial deference in § 1988 fee matters to the discretion of the district court, which has "close and intimate knowledge of the efforts expended and the value of the services rendered." *McManama v. Lukhard,* 616 F.2d 727, 729 (4th Cir.1980); *see Hensley,* 461 U.S. at 436–37, 103 S.Ct. at 1940–41. In exercising that discretion on remand, the district court should attend to the informing legal principles on exclusion of hours for unsuccessful distinct claims or reduction based on limited overall success, relevant market hourly rates in civil rights cases, and the attorneys' use of private-sector quality "billing judgment."

## IX

Finally, the appellants challenge an order of the district court holding their trial counsel in contempt for violating a court order requiring production of several witness statements. As explained more fully below, the court appointed a private prosecutor after the conclusion of the second trial to investigate the possibility of bringing criminal contempt charges against Baltimore County Attorneys John Austin and James Beach for their refusal to produce certain crucial witness statements.

---

**13.** By way of illustration, we note that the district court credited over 300 hours for legal research performed by two associates who assisted Gately and Whitney. Although the district court observed that this case was largely fact-intensive, it approved the more than 300 hours of associates' research, in addition to the substantial research performed by Whitney, on the ground that "legal research is necessary to master the vermiform aspects of § 1983." J.A. at 939. The district court should reconsider on

remand whether these were hours reasonably expended in light of plaintiffs' choice not to retain counsel with experience in civil rights litigation. *Cf. Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939 (counsel for the prevailing party should use the same "billing judgment" he would use in the private sector and "make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary."); *Spell v. McDaniel II,* 852 F.2d 762, 768–70 (4th Cir.1988).

Though the court later denied the private prosecutor's application for a show cause order under Fed.R.Crim.P. 42(b), thus aborting the criminal investigation, it held Austin and Beach in civil contempt and imposed sanctions under Fed.R.Civ.P. 37(b)(2)(D) and the court's inherent authority. The court ordered Austin and Beach each to pay to the clerk of the court $6,785.37, an amount representing a quarter of the costs incurred in the private prosecution. On appeal, the appellants contend that these sanctions were in substance based on a finding of criminal contempt made without the necessary procedural requirements. We agree with the appellants that the order imposing sanctions must be vacated and remanded.

### A

In December 1987, shortly after the filing of the complaint, the Buffingtons served on the County a request for production of documents. The following requests are relevant here:

2. Any and all documents concerning or relating to the arrest, booking, detention, and death of James E. Buffington.

3. Any and all documents concerning or relating to any investigation by the Baltimore County Police department as to the death of James E. Buffington.

. . . .

19. Any and all documents concerning or relating to any oral or written statement given by any witness to the arrest, booking, treatment, incarceration, or death of James E. Buffington.

20. Any and all written or recorded statements given by any witness to the arrest, booking, treatment, incarceration or death of James E. Buffington.

21. Any and all documents, reports, and other printed or written materials concerning or relating to each individual who was detained, arrested, or incarcerated at the Wilkens Avenue Police Station lockup facility from 12:01 p.m. on March 18, 1987 through 10 a.m. on March 19, 1987.

J.A. at 979–80.

In a February 17, 1988, order, the district court denied the County's motion for a protective order and ordered production of all requested documents. The County then answered the documents request, stating that it was producing or had already produced all responsive documents and that it "reserve[d] the right to supplement this answer in the event additional documents and/or tangible property requested herein are discovered or becomes [sic] available." J.A. at 459.

Concerned about some evidence presented at the first trial, County Attorney James Beach asked the police department to reopen their earlier command investigation to the extent of locating and interviewing the detainees at the Wilkens precinct on the morning of the Buffington suicide. During the renewed investigation, seven detainees were interviewed, and four gave taped statements that, contrary to police testimony at the first trial, Buffington was not docile and calm while being held, but was instead screaming and openly threatening suicide. County Attorneys Austin and Beach received transcribed copies of these statements before the second trial, but did not supplement their earlier response to the document request with these statements.

At the second trial, several police officers again testified that James was docile while in custody at the station. This testimony supported the defendants' argument at trial that the individual defendant officers could not have known that Buffington was about to commit suicide. During trial, plaintiffs' counsel learned of the possible existence of the detainees' contradictory statements and pointedly asked Austin about them. Austin stated only that he would "look into the matter." On the day after the jury returned its verdict, plaintiffs' counsel demanded that Austin and Beach produce any detainees' statements they might have in their possession. The next day, after further demand, Austin and Beach finally produced the seven witness

statements obtained in the internal investigation.

On February 9, the Buffingtons filed a motion for sanctions against Austin and Beach. The Buffingtons asserted that the refusal to produce the witness statements was a violation of the court's February 17, 1988, discovery order and that the statements would have had a significant impact on the jury's consideration of possible punitive damages, none of which were awarded. Acknowledging that "[t]he normal remedy for a party aggrieved by opposing counsel's concealment of material evidence is to move for a new trial," J.A. at 458, the Buffingtons nonetheless declined to seek a new trial to prove punitive damages. Instead, they urged the court to impose sanctions on Austin and Beach pursuant to a finding of criminal contempt or, in the alternative, civil contempt because "failure to impose an appropriate fine would only encourage Baltimore County and its counsel to flout court orders and hide evidence in future litigation." *Id.*

The district court considered the suggestion of criminal contempt to have merit and, following the procedure outlined in *Young v. United States ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 801, 107 S.Ct. 2124, 2134, 95 L.Ed.2d 740 (1987), initially referred the matter to the United States Attorney for the District of Maryland. After the U.S. Attorney declined to prosecute, the court, citing *Young*, appointed a private prosecutor on March 9. The court later granted the private prosecutor's motions, made under seal, for an order to take depositions, Fed.R.Crim.P. 17(f), and for early production of documents, Fed.R.

Crim.P. 17(c), and denied Austin's and Beach's motions to quash subpoenas. On May 23, the private prosecutor filed under seal an application for an order under Fed.R.Crim.P. 42(b) requiring Austin and Beach to appear and show cause why they should not be held in criminal contempt. The proposed order specified the conduct alleged to constitute criminal contempt under the federal criminal contempt statute, 18 U.S.C. § 401. The district court held a hearing on the application for the show cause order on June 9. On June 26, the court denied the application, bringing to a halt the criminal contempt proceedings.

On the same day, however, the court issued an order granting the Buffingtons' motion for sanctions pursuant to a finding, "[b]y clear and convincing evidence," J.A. at 1009, of civil contempt. The court held Austin and Beach in contempt for violating the February 17, 1988, discovery order by failing to supplement their response to the documents request with the later-discovered witness statements. The court reasoned that Fed.R.Civ.P. 26(e)(2)(B) [14] imposed on Austin and Beach an obligation under the circumstances to supplement their earlier response. Drawing a "weighty inference of knowing concealment from the sheer importance of these witness statements to the issues at trial," J.A. at 1001, the court found the failure to supplement to constitute a violation of Rule 26(e)(2)(B) and the court's February 17 order. Citing its authority under Fed.R.Civ.P. 37(b)(2)(D) to issue a contempt order for failure to obey a court order and its inherent authority to control discovery, the court held Austin and Beach in civil contempt. [15] The sanc-

---

**14.** Fed.R.Civ.P. 26(e)(2)(B) provides, in pertinent part:

> A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except ... [that a] party is under a duty seasonably to amend a prior response if the party obtains information upon the basis of which ... the party knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.

**15.** The court's attempt to invoke Rule 37(b)(2) as a source of its authority to sanction this conduct was inappropriate, but its alternative reliance on the court's inherent power to control discovery was proper. Rule 37(b) sanctions apply only to violations of a court order to permit or provide discovery, or one in regard to a discovery conference. They do not apply to a violation of the duty, arising in limited circumstances under Rule 26(e), to supplement a discovery response. *See, e.g., Outley v. City of New York*, 837 F.2d 587, 589 (2d Cir.1988). The February 17 order in this case did not impose a duty to supplement the earlier response to the documents request, though the order could have

tion imposed on each attorney was a fine of $6,785.37, payable to the clerk of the court, representing one-fourth of the costs incurred in the private prosecutor's truncated investigation.[16] The court characterized this sanction as "strictly compensatory." J.A. at 1009.

### B

The appellants contend that the district court's ruling was in substance a finding of criminal contempt and that the sanctions are invalid because they were imposed without the procedural protections required for a criminal contempt finding. We agree, and accordingly vacate and remand the order imposing sanctions.

 The first issue in reviewing a contempt sanction is whether the contempt sanction is properly characterized as civil or criminal, as this determination may bear on the type of notice required, the applicable standard of proof, and other issues. *Smith v. Sullivan,* 611 F.2d 1050, 1052 (5th Cir.1980). A district court's description of a contempt sanction as either civil or criminal is not determinative and must be scrutinized independently by the appellate court. *See Shillitani v. United States,* 384 U.S. 364, 369, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966). Although the distinctions between civil and criminal contempt often become blurred when applied to particular cases, they are clear enough in the abstract: When the nature of the relief and the purpose for which the contempt sanction is imposed is remedial and intended to coerce the contemnor into compliance with court orders or to compensate the com-

plainant for losses sustained, the contempt is civil; if, on the other hand, the relief seeks to vindicate the authority of the court by punishing the contemnor and deterring future litigants' misconduct, the contempt is criminal. *See United States v. United Mine Workers,* 330 U.S. 258, 302–04, 67 S.Ct. 677, 700–02, 91 L.Ed. 884 (1947); 3 C. Wright, *Federal Practice & Procedure: Criminal 2d* § 704, at 823–24 (1982). In treating a particular contempt sanction as civil or criminal, "the critical features are the substance of the proceeding and the character of the relief that the proceeding will afford." *Hicks v. Feiock,* 485 U.S. 624, 631, 108 S.Ct. 1423, 1429, 99 L.Ed.2d 721 (1988). In *Hicks,* the Supreme Court clarified "a few straightforward rules" for ascertaining "the character of the relief":

> If the relief provided is a sentence of imprisonment, it is remedial if "the defendant stands committed unless and until he performs the affirmative act required by the court's order," and is punitive if "the sentence is limited to imprisonment for a definite period." If the relief provided is a fine, it is remedial when it is paid to the complainant, and punitive when it is paid to the court, though a fine that would be payable to the court is also remedial when the defendant can avoid paying the fine simply by performing the affirmative act required by the court's order. These distinctions lead up to the fundamental proposition that criminal penalties may not be imposed on someone who has not been afforded the protections that the

---

so provided. *See* Fed.R.Civ.P. 26(e)(3); *United States v. IBM Corp,* 83 F.R.D. 92, 96 (S.D.N.Y. 1979). Rather, the duty to supplement arose, if at all, under Rule 26(e)(2)(B). Because Rule 37 sanctions are not available to sanction violations of Rule 26(e), courts and commentators have recognized that reliance on the inherent power of the court to sanction violations of this discovery rule is fitting. *See Outley,* 837 F.2d at 589; *Bradley v. United States,* 866 F.2d 120, 124 n. 6 (5th Cir.1989) (power to sanction for violation of Rule 26(e) either implicit in rule or derived from court's inherent power); *Campbell Indus. v. M/V Gemini,* 619 F.2d 24, 27 (9th Cir.1980) ("Few would question a court's inherent power to discipline breaches of Rule 26(e),

even in the absence of a court order"); 8 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2050, at 325–26 (1970) ("In the absence of a rule speaking to the question [of sanctions for Rule 26(e) violations], reliance must be on the inherent power of the court.").

**16.** The Administrative Office of the United States Courts has adopted a policy of reimbursing attorneys appointed as private prosecutors in contempt actions. *See Young,* 481 U.S. at 806 n. 17, 107 S.Ct. at 2137 n. 17. The district court was aware of this policy and noted that half of the prosecutor's fees in this case would come from that source.

Constitution requires of such criminal proceedings, including the requirement that the offense be proved beyond a reasonable doubt.

*Id.* at 631–32, 108 S.Ct. at 1429–30 (citations omitted).

■ The contempt sanction in this case was punitive—a fine payable to the court, not conditioned on compliance with a court order. (As the court noted, compliance with the discovery order, or, more precisely, the duty to supplement arising under Rule 26(e), had now become impossible.) There is no doubt that the district court can impose a fixed, monetary, civil contempt sanction to compensate for losses sustained by violation of a discovery order or of Rule 26(e). Fed.R.Civ.P. 37(b)(2) (discovery order violation); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (same); *Perkinson v. Gilbert–Robertson, Inc.,* 821 F.2d 686 (D.C. Cir.1987) (Rule 26(e) violation). In such cases, however, the sanctions are payable to the complaining adverse party, and the amount is determined by losses flowing from expenses incurred as a result of the violation. The relief in this case, however, was not tailored to compensate the complaining party—the Buffingtons—for any losses incurred by them as a result of the defendants' failure to comply with their duty to supplement their earlier response to the court order. Rather, it compensated for half of the expenses incurred in the court's effort to "vindicate its authority" by setting in motion the private prosecutor's investigation and was payable directly to the court. *See Falstaff Brewing Corp. v. Miller Brewing Co.,* 702 F.2d 770, 779 (9th Cir.1983) (judgment of contempt was criminal where fine paid to court had purpose of punishing plaintiff for completed acts of disobedience in failing to return confidential documents). The fact that this punitive fine had the incidental effect of compensating for the costs of prosecuting the violation is neither surprising nor deter-

minative of its character. *See Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 443, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911) ("It is true that either form of [sanction] has also an incidental effect" that can be viewed as promoting the purpose of the alternate form of sanction).

We derive our conclusion that requiring contemnors to fund their own halted criminal contempt prosecution constitutes a punitive, criminal sanction, imposed as an incident of the court's effort to vindicate its authority, from the nature of the relief itself. *See Hicks,* 485 U.S. at 636, 108 S.Ct. at 1432. Moreover, the substance of the proceedings and the court's express statement of its reason for imposing sanctions corroborate this conclusion. *See id.* at 635, 108 S.Ct. at 1431 ("the purposes that lie behind the particular kinds of relief are germane to understanding their character."). It is undisputed that the contempt proceedings were initiated to vindicate the authority of the court and to punish the actions of the alleged contemnors. *See, e.g.,* J.A. at 797 (letter of district court seeking appointment of U.S. Attorney stating that "[w]hile reviewing the matter, the prosecutor's duty is clear: He 'is appointed solely to pursue the public interest in vindication of the court's authority'" (quoting *Young,* 481 U.S. at 804, 107 S.Ct. at 2135)). Nor is there any dispute that the "substance of the proceeding[s]," *Hicks,* 485 U.S. at 631, 108 S.Ct. at 1429, as they progressed through the early stages of investigation, was criminal—the private prosecutor had obtained discovery authorization under rules of criminal procedure and had reached the stage of applying to the court for a show cause order, pursuant to Fed.R. Crim.P. 42(b). That application was denied on the same day that the court issued its order holding Austin and Beach in contempt.[17] Furthermore the district court's statements of its reasons for imposing the sanctions discloses a predominately punitive intent, consistent with the nature of

17. Because the proceedings were criminal in nature until the court's denial of the application for the show cause order and concurrent imposition of "civil" sanctions, there is no merit to the Buffingtons' contention that the appellants

failed to preserve their objection to the lack of criminal contempt procedural protections. The denial of those protections first occurred when the sanction was imposed, at which point this appeal was noted.

the relief actually imposed—an unconditional fine payable to the court: "In this case, as well as in future cases where counsel do not comply with an order requiring production of documents, counsel can ultimately produce one of two things: the documents or a negotiable instrument payable to the Clerk of the Court." J.A. at 1008. We hold, therefore, that the district court imposed a criminal contempt sanction in this case.

### C

The Buffingtons argue that if we hold, as we have, that these contempt sanctions were criminal, we could nonetheless affirm them because the district court substantially complied with the procedural protections necessary for a judgment of criminal contempt. We disagree. Regardless of whether Austin and Beach had sufficient notice of the charges and the institution of a criminal contempt proceeding, there is no indication in this record that they ever had or waived a hearing on the charges. *See In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948) (party charged with contempt has constitutional right to be heard by way of defense or explanation); *Yates v. United States*, 316 F.2d 718, 725 (10th Cir.1963) (right to hearing may be waived). The June 9 hearing on the private prosecutor's application for a show cause order does not satisfy this requirement.[18] Most fundamentally, however, the criminal contempt finding here is flawed because it was based only on "clear and convincing evidence." J.A. at 1009. A finding of criminal contempt must be based on proof beyond a reasonable doubt. *Hicks*, 485 U.S. at 632, 108 S.Ct. at 1430.

### D

Although we agree with the appellants that the contempt sanctions imposed in this case were criminal in nature and must be vacated because they were not imposed under proper procedures, we reject the appellants' alternative argument that the district court erred in imposing any sanction because no obligation to produce the witness statements existed. As we understand their argument, the appellants' first contention is that the February 17 order did not obligate them to produce the later-created witness statements. But, as noted, *see supra* n. 15, sanctions for a violation of Rule 26(e) may be imposed under the court's inherent power even though no order compelling the discovery was violated. Appellants' next point—that they did not breach any duty created by Rule 26(e)—deserves little attention. There was no clear error in the district court's subsidiary factfindings that Austin and Beach had possession of the detainees' witness statements before the second trial and that the refusal to apprise the Buffingtons of those critical statements permitted drawing the "weighty inference of knowing concealment."[19] Accordingly, the district court did not abuse its discretion to the extent that it found a sanctionable violation of Rule 26(e)(2)(B).

Any monetary sanction the court might impose on remand without reinstituting criminal proceedings must be civil in character: it must be designed to compensate the complaining party—the Buffingtons—for losses they incurred as a result of the violation of the discovery duty. Of course, any compensatory sanction payable to the Buffingtons must not overlap with the district court's award of attorneys' fees and expenses, a matter that must also be addressed on remand. Any reinstituted criminal contempt proceedings must of course comply with the requisites of the Federal Rules of Criminal Procedure and

---

18. The contents of this closed hearing have never been transcribed.

19. The appellants' highly debatable assertion that the Buffingtons could have found and interviewed these detainee-witnesses themselves is irrelevant to whether they breached their duty under the discovery rules. The further contention that these witness statements obtained in an internal police investigation were protected work product is equally meritless. *See, e.g., Mercy v. County of Suffolk*, 93 F.R.D. 520, 522 (E.D.N.Y.1982) (work product doctrine does not apply to statements made in internal police investigation).

the constitutional protections afforded defendants in such proceedings. *See Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); 3 C. Wright, *supra*, §§ 709–14.[20]

## X

For the foregoing reasons, we affirm the judgments against Officers Tucker and Gaigalas, reverse the judgments against Chief Behan and Baltimore County on both the § 1983 and state law claims, vacate and remand the award of the Buffingtons' attorneys' fees, and vacate and remand the contempt sanctions against County Attorneys Austin and Beach.

AFFIRMED IN PART; REVERSED IN PART; VACATED AND REMANDED IN PART.

---

**20.** A renewed prosecution of Austin and Beach would not raise double jeopardy concerns. Jeopardy did not attach in the prior proceedings because neither a jury was impanelled, the point at which jeopardy attaches in a jury trial, nor evidence heard, the point at which jeopardy attaches in a bench trial. *See Serfass v. United States*, 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975).