**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-7529**

---

JESUS EMMANUEL JEHOVAH, a/k/a Robert Gabriel Love, a/k/a Gabriel Alexander Antonio,

      Plaintiff - Appellant,

     v.

HAROLD W. CLARKE, Director; A. DAVID ROBINSON, Deputy Director,

      Defendants – Appellees,

    and

COMMONWEALTH OF VIRGINIA; LORETTA K. KELLY, Warden, Sussex I State Prison; ALL EMPLOYEES OF THE VIRGINIA DEPARTMENT OF CORRECTIONS, in their official, individual, and private capacities, jointly and severally; EDDIE L. PEARSON, Warden; KEISHA FOWLKES, Unit Manager; MS. EVANS, Records Officer; MS. ANSAH, Corporal; ARMOR CORRECTIONAL HEALTH SERVICES, INC.; ANTHONY KING, Dr.; MESELE GEBREYES, Dr.; BENJAMIN ULEP, Dr.,

      Defendants.

---

Appeal from the United States District Court for the Eastern district of Virginia, at Alexandria. James C. Cacheris, Senior District Judge. (1:12-cv-00087-JCC-IDD)

---

Argued: May 12, 2015             Decided: July 9, 2015

Amended: July 22, 2015

---

Before TRAXLER, Chief Circuit Judge, GREGORY, and FLOYD, Circuit Judges.

Reversed and remanded by published opinion.  Judge Gregory wrote the opinion, in which Chief Judge Traxler and Judge Floyd joined.

─────────────────

**ARGUED:**  Lola Abbas Kingo, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant.  Trevor Stephen Cox, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.  **ON BRIEF:**  Steven H. Goldblatt, Director, Clay Greenberg, Student Counsel, Elizabeth Purcell, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant.  Mark R. Herring, Attorney General of Virginia, Cynthia E. Hudson, Chief Deputy Attorney General, Linda L. Bryant, Deputy Attorney General, Public Safety & Enforcement, Richard C. Vorhis, Senior Assistant Attorney General, Kate E. Dwyre, Assistant Attorney General, Stuart A. Raphael, Solicitor General of Virginia, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees.

─────────────────

GREGORY, Circuit Judge:

Inmate Jesus Emmanuel Jehovah appeals from the district court's dismissal of his pro se claims against the Commonwealth of Virginia and various employees and contractors of the Virginia Department of Corrections ("VDOC"). Jehovah claims that Appellees violated his free exercise rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA") by a) prohibiting him from consuming wine during communion, b) requiring him to work on Sabbath days, and c) assigning him non-Christian cellmates. Jehovah also alleges that Appellees demonstrated deliberate indifference to his medical needs in violation of the Eighth Amendment. The district court dismissed sua sponte Jehovah's Sabbath claims, cell assignment claims, and deliberate indifference claim, and granted Appellees summary judgment on the communion wine claim. We reverse the district court's judgment in its entirety and remand for further proceedings.

**I.**

Jehovah is a VDOC inmate who was incarcerated at Sussex I Prison ("SIP") in Waverly, Virginia when he filed this lawsuit. In his pro se complaint, he alleges four courses of action taken by VDOC employees that he claims violated his rights under RLUIPA and the First and Eighth Amendments.

3

First, Jehovah claims that various policies have prevented him from taking communion in the manner required by his religious beliefs. Jehovah's religion[1] mandates that he take communion by drinking red wine and consuming bread dipped in honey, olive oil, sugar, cinnamon, and water. While he was incarcerated at Nottoway Correctional Center ("NCC") from September 2009 to March 2010, Jehovah was not permitted to take communion at all pursuant to a memorandum prohibiting the practice for inmates in segregation. In April 2010, Jehovah was transferred to SIP and placed in the general population. Jehovah requested permission from the warden to take communion but did not receive a response, so he filed a grievance. In January 2011, while Jehovah's grievance was pending, VDOC issued a new policy prohibiting all inmates from consuming wine during communion. Jehovah filed another grievance, which VDOC denied. VDOC revised its policy in January 2012 to allow inmates to consume bread dipped in wine but not to drink wine. Jehovah filed a third grievance, which was also denied. In

---

[1] Jehovah appears to adhere to his own particular brand of Christianity, citing to a version of the Bible written by himself. See J.A. 23 (Compl. n.1). Appellees do not challenge the sincerity of his beliefs, and it is not within the courts' purview to "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." Hernandez v. Comm'r of Internal Revenue, 490 U.S. 680, 699 (1989).

December 2012, VDOC changed its policy yet again to ban inmates from consuming communion wine by any method.[2]

Second, Jehovah asserts that he has been unable to secure a job that will allow him to observe his Sabbaths. Jehovah's faith prohibits him from working during the "Old Jewish Sabbath" (Friday sundown to Saturday sundown) or the "New Christic Sabbath" (Saturday at sunset to Monday at sunrise).[3] VDOC requires inmates to participate in programming -- including work and educational activities -- for a certain number of hours per week in order to be eligible for good conduct allowances and earned sentence credits. See Va. Code § 53.1-32.1. In February 2011 Jehovah was assigned to a cleaning position, and his supervisor required him to work seven days a week. Jehovah requested that VDOC accommodate his observance of the Sabbaths, but VDOC refused, informing him that his failure to work could lead to sanctions. He filed a grievance, which VDOC denied. VDOC staff has not approved him for any job for which he has applied since December 2011, including jobs for which they had previously approved him.[4] According to

---

[2] This policy, like the January 2011 policy, allows clergy to consume wine during services but permits inmates to drink only wine substitutes such as grape juice.

[3] Jehovah is required to devote these days to religious observance and instruction.

[4] Jehovah lost his cleaning job on May 17, 2011 after being placed in segregation.

5

Jehovah, "there are few prison jobs available to him at SIP and other prisons which he can work and keep observing the Sabbaths." J.A. 27 (Compl. ¶ 32).

Third, Jehovah states that VDOC has housed him with "people who are anti-Christian and unbelievers," contrary to his religious beliefs. J.A. 28 (Compl. ¶ 34). Jehovah "is directed by God not to be yoked to unbelievers." J.A. 28 (Compl. ¶ 34). At one point Jehovah was housed with a "self-proclaimed Satanist and anti-Christian," even though VDOC knew of Jehovah's religious views. J.A. 28 (Compl. ¶ 35). This inmate harassed Jehovah and subjected him to "anti-Christian, anti-Jewish, anti-God . . . rhetoric." J.A. 28 (Compl. ¶ 35). After several requests to be reassigned, Jehovah filed a grievance to which VDOC never responded. Since July 2011, Jehovah has been assigned to live with "an atheist, an agnostic, a worldly Muslim, a false/non-practicing insincere Christian, a racist black anti-Christian atheist, a self-proclaimed 'Hell's Angel' biker, and a black anti-Christian from an anti-white gang." J.A. 29 (Compl. n.18). Other VDOC prisons had been able to accommodate Jehovah's requests to be housed only with Christians.

Finally, Jehovah alleges that he has suffered various medical ailments that VDOC medical staff have deliberately ignored. In 2009 while incarcerated at NCC, Jehovah experienced, among other things, tongue lesions, chest and throat pain, difficulty

6

swallowing, coughing, nausea, lethargy, and unexplained weight loss. After medical staff at NCC "detected and acknowledged" Jehovah's symptoms but before they could diagnose them, Jehovah was transferred to SIP on March 26, 2010. J.A. 30 (Compl. ¶ 43). Jehovah developed further symptoms after arriving at SIP, and after testing negative for strep throat he was referred to Dr. King. On April 15, 2010, Dr. King examined Jehovah for the first time. He found holes in Jehovah's tonsils but "did not acknowledge" any of Jehovah's other symptoms; he ordered a test for HIV, which was negative, and then did not provide any further care. J.A. 30 (Compl. ¶ 45). Jehovah's symptoms worsened, and he sought additional treatment from Dr. King on June 17, 2010. Dr. King ignored all of Jehovah's symptoms except his coughing, neck lesion, and nasal drip.[5] Dr. King ordered a chest x-ray and urine and blood tests: the x-ray appeared normal but the urine and blood tests revealed abnormalities consistent with infection. Jehovah maintains Dr. King ignored these results and provided no further treatment. Jehovah saw Dr. King again on July 30, 2010, and

---

[5] At this point in time, Jehovah's alleged symptoms included: "coughing with unusual whitish phlegm, [a] patch of hair loss and neck lesion on His neck, fatigue, dizziness, night sweats, nasal drip, weight loss, a lump under [h]is left ear, chest pains, chest burning sensations, involuntary muscle spasms throughout [h]is body, headaches, difficulty sleeping, swollen lymph nodes, and other symptoms." J.A. 30 (Compl. ¶ 46).

7

Dr. King referred him to mental health staff, who ultimately determined that he had no psychological problems. Jehovah's condition continued to deteriorate.[6] When Jehovah next saw Dr. King on August 30, 2010, Dr. King "disregarded most" of his symptoms and treated him for gastroesophageal reflux disease with Prilosec, which made many of Jehovah's symptoms worse. J.A. 31 (Compl. ¶ 48). Dr. King also referred Jehovah to mental health staff again to be evaluated for bipolar disorder, of which staff found no symptoms. This pattern continued into 2012, with Dr. King and other VDOC doctors allegedly acknowledging only some of Jehovah's symptoms, ignoring test results indicating infection, and failing to improve Jehovah's condition.[7]

---

[6] Additional symptoms included "tinnitus/ringing sensations in [h]is hearing/ears, popping and bubbling sounds and sensations and pains in [h]is ears and ear canals; episodic problems concentrating, slowed cognitive functioning, malaise, and dizziness; abdominal pains, abnormal stools, and rapidly passing consumed meals; more difficulty swallowing and persistent sensations of something being caught in [h]is throat, neck pain, and sore and tender swollen nodes and tissues in his neck; more chest pains and of greater intensity, and bones in [h]is sternum area slightly, audibly, and painfully popping and moving out of place; worsening muscle spasms, and spontaneous irregular and painful heartbeats." J.A. 31 (Compl. ¶ 47).

[7] In 2013, Jehovah filed a notice with the district court stating that an ultrasound electrocardiogram had revealed that for two years he had been suffering from pulmonary hypertension with right ventricle hypertrophy, an irreversible and often fatal condition.

8

Jehovah filed this lawsuit on July 11, 2012, seeking compensatory and injunctive relief for these alleged violations of RLUIPA, the First Amendment, and the Eighth Amendment. On September 27, 2012, the district court sua sponte dismissed all of Jehovah's claims except his communion claim pursuant to the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. § 1915A. Appellees moved to dismiss the remaining claim on December 21, 2012. In support of their motion they submitted a declaration from VDOC Chief of Corrections Operations A. David Robinson discussing the purposes of the wine ban. Jehovah responded with numerous discovery requests to which Appellees responded in part and otherwise objected. He then filed a motion to compel discovery and to hold an evidentiary hearing, which the district court denied on May 17, 2013. On August 20, 2013, the court granted Appellees' summary judgment motion and dismissed Jehovah's RLUIPA and First Amendment claims regarding the communion wine ban. Jehovah timely appealed the dismissal of all his claims.

## II.

On appeal, Jehovah argues that the district court erred in 1) dismissing his Sabbath, cell assignment, and deliberate indifference claims under § 1915A, and 2) granting Appellees summary judgment on his communion wine claim.

9

We review de novo a § 1915A dismissal for failure to state a claim. Slade v. Hampton Roads Reg'l Jail, 407 F.3d 243, 248 (4th Cir. 2005). Dismissal is proper only if the plaintiff has failed to "present factual allegations that 'state a claim to relief that is plausible on its face.'" Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014). Similarly, we review de novo a grant of summary judgment. Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004). We must "view[] the facts and inferences drawn therefrom in the light most favorable to the non-moving party." Id. Summary judgment is inappropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

We must construe pro se complaints liberally, Jackson, 775 F.3d at 178, and "[l]iberal construction of the pleadings is particularly appropriate where, as here, there is a pro se complaint raising civil rights issues," Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) (alteration in original).

## III.

The First Amendment's protection of the right to exercise religious beliefs extends to all citizens, including inmates. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987). In Turner v. Safley, the Supreme Court held that "when a prison regulation

10

impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). The Turner Court laid out a four-factor test for determining whether a prison regulation that infringes on an inmate's First Amendment rights is nonetheless reasonable and therefore constitutionally valid. First, is there "a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it[?]" Id. Second, are there "alternative means of exercising the right that remain open to prison inmates[?]" Id. at 90. Third, what is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally[?]" Id. And finally, do there exist "obvious, easy alternatives" suggesting that the regulation is "an 'exaggerated response' to prison concerns[?]" Id. Under this framework, "[t]he burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

RLUIPA provides more stringent protection of prisoners' free exercise rights than does the First Amendment, applying "strict scrutiny instead of reasonableness." Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir. 2006). It prohibits any government entity from imposing a "substantial burden" on an inmate's religious exercise unless the burden "is in furtherance of a compelling governmental

11

interest" and "is the least restrictive means of furthering that . . . interest." 42 U.S.C. § 2000cc-1(a). The inmate bears the initial burden of showing a substantial burden on her religious exercise, but the government must establish that the burden is the least restrictive way to further a compelling governmental interest. Id. § 2000cc-2(b). "The least-restrictive-means standard is exceptionally demanding, and it requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." Holt v. Hobbs, 135 S. Ct. 853, 864 (2015) (internal quotation marks and alterations omitted).

## A.

Jehovah and Appellees agree that summary judgment of Jehovah's RLUIPA claim regarding VDOC's wine ban was improper for two reasons. First, Jehovah did not have the opportunity to brief the issue of whether the wine ban substantially burdened his religious exercise. The district court held that Jehovah had not demonstrated a substantial burden. But the court had previously found, during the motion-to-dismiss stage, that "[p]rohibiting plaintiff from taking wine with communion burdens the exercise of his religion." J.A. 55. Because of this, the parties did not address the substantial burden prong of RLUIPA in their summary judgment briefing. A district court may resolve a motion for

12

summary judgment on grounds not raised by a party, but it must first provide notice and a reasonable time to respond. Fed. R. Civ. P. 56(f); see also Coward v. Jabe, 532 F. App'x 328, 329 (4th Cir. 2013) (unpublished) ("After giving notice and a reasonable time to respond, the district court may grant a motion for summary judgment on grounds not raised by a party."). Jehovah was not afforded the requisite opportunity to demonstrate an issue of material fact regarding the burden imposed by the wine ban.

Second, the parties agree that the record is insufficient to support the conclusion that the wine ban is the least restrictive means to address the government's purported security interest.[8] The Robinson Affidavit, which Appellees proffered in support of their summary judgment motion, does not even attempt to explain why an absolute ban is the least restrictive measure available. At the very least, the government must "acknowledge and give some consideration to less restrictive alternatives." Couch v. Jabe, 679 F.3d 197, 203 (4th Cir. 2012).[9] Both Jehovah and Appellees

---

[8] Jehovah also argues that a genuine issue of material fact exists as to whether the government's security interest is compelling. Appellant's Br. 38-40.

[9] Jehovah has put forth a number of less restrictive alternatives, including: 1) to apply the same security measures used for medication to wine, 2) to allow Jehovah an accommodation to drink wine, and 3) to exclude inmates who have been convicted of infractions involving stealing or alcohol and inmates with a history of alcoholism.

13

agree that this burden has not yet been satisfied, and we agree. Therefore, we reverse the district court's summary dismissal of Jehovah's RLUIPA wine ban claim and remand for further proceedings.

Although we must subject Jehovah's First Amendment claim to a standard more deferential to VDOC, we find that a reasonable jury could rule in Jehovah's favor. Under Turner, Jehovah bears the burden of showing not only that his religious exercise was substantially burdened, but also that the wine ban is not "reasonably related to legitimate penological interests." 482 U.S. at 89; see also Overton, 539 U.S. at 132. The district court based its First Amendment holding on its finding that Jehovah failed to demonstrate a substantial burden on his religious exercise. As with the RLUIPA claim, the court failed to provide notice that it would be considering this alternative ground for summary judgment. However, we may affirm the district court's grant of summary judgment on any ground in the record. Bryant v. Bell Atlantic Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002). Therefore, we must determine whether a genuine issue of material fact exists regarding whether the wine ban is unreasonable under Turner.

Turner's first prong asks whether there is a rational connection between a legitimate penological interest and the policy infringing on an inmate's free exercise. 482 U.S. at 89. The Robinson Affidavit attests that the communion wine policy is

14

motivated by "safety and security concerns," specifically intended to avoid the mishandling of alcohol and to prevent inmates who have struggled with alcoholism from engaging in unhealthy behavior. J.A. 81-82. Promoting the inmates' safety and health is a legitimate concern. See McRae v. Johnson, 261 F. App'x 554, 558 (4th Cir. 2008) (unpublished) (finding that "in the prison setting, suppression of contraband . . . [and] maintaining the health and safety of inmates and staff . . . constitute compelling governmental interests." (emphasis added) (citing Cutter v. Wilkinson, 544 U.S. 709, 722 (2005)). It also seems clear that the communion wine ban is, in the most general sense, logically connected to its asserted goal: restricting inmate wine consumption is a rational approach to preventing alcohol misuse and abuse. What is unclear, however, is whether the other Turner prongs – the availability of alternative means of exercising the right, the impact of accommodation, and the existence of alternatives -- support the conclusion that the wine ban is reasonable.

In the First Amendment context, "the availability of alternative means of practicing religion is a relevant consideration." Holt, 135 S. Ct. at 862; see also O'Lone, 482 U.S. at 351-52 (analyzing an absolute ban on attending Jumu'ah and addressing whether inmates "retain the ability to participate in other Muslim ceremonies" (emphasis added)). Although the ban at

15

issue prohibits drinking wine at communion, it does not prevent inmates from engaging in other aspects of communion, nor does it affect other religious practices.  It is noteworthy, however, that a previous version of the ban permitted inmates to consume wafers dipped in wine.  That version, like the current one, allowed clergy to bring one fluid ounce of wine into the prison.  Neither version categorically prohibits alcohol on the premises.  The only difference between the two policies is that inmates used to have an alternative means of consuming communion wine in a controlled environment, whereas now they are completely barred from participating in that practice.

Regarding the impact of an accommodation on other inmates, guards, and prison resources, the record is largely silent. Drawing reasonable inferences in Jehovah's favor, however, a reasonable jury could find that exempting Jehovah from the ban would have a minimal impact on prison resources.  Wine is already permitted on the premises, and religious services take place in a controlled environment in which Jehovah would be supervised. Furthermore, a jury could find that the prison population would not be endangered by a single inmate with no history of alcohol abuse consuming a small amount of wine in this setting.

Finally, Jehovah has proposed several alternatives to the ban, including:  1) to apply the same security measures used for medication to wine, 2) to allow Jehovah an accommodation to drink

16

wine, and 3) to apply the ban only to inmates who have been convicted of infractions involving stealing or alcohol and inmates with a history of alcoholism. A reasonable jury could find that at least one of these alternatives is so "obvious" and "easy" as to suggest that the ban is "an exaggerated response." Turner, 482 U.S. at 90. Therefore, we reverse the district court's summary dismissal of Jehovah's First Amendment wine communion claim.

**B.**

The district court dismissed Jehovah's Sabbath work claims because "prisoners have no constitutional right to job opportunities while incarcerated." J.A. 56. As Jehovah rightly points out, however, this is not the correct focus of the RLUIPA and First Amendment inquiries. The constitutional right in jeopardy is Jehovah's right to free exercise of his religious beliefs; the unavailability of prison jobs accommodating his Sabbath schedule is the alleged burden on that right.

To state a RLUIPA claim, Jehovah need only plead facts tending to show a substantial burden on his exercise of sincerely held religious beliefs. 42 U.S.C. § 2000cc-2(b); see also Hartmann v. Cal. Dep't of Corr. & Rehab., 707 F.3d 1114, 1125 (9th Cir. 2013) ("To survive a motion to dismiss on their RLUIPA claim, plaintiffs must allege facts plausibly showing that the challenged policy and the practices it engenders impose a substantial burden on the exercise of their religious beliefs."). "[A] substantial burden

17

on religious exercise occurs when a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." Lovelace, 472 F.3d at 187 (internal quotation marks and alterations omitted).

Here, Jehovah has alleged that his religion requires him to abstain from working during the "Old Jewish" and "New Christic" Sabbaths. He has pled that his cleaning job would not accommodate his Sabbath observances, that his requests for job transfers were denied, and that VDOC staff has not approved him for any job for which he has applied since December 2011. He has further alleged that he will face sanctions and lose the opportunity to accrue good conduct allowances and earned sentence credits if he fails to work for 30-40 hours per week.

Appellees argue that Jehovah simply wishes more jobs would accommodate his Sabbath schedule, and that therefore he is not substantially burdened. They rely on Jehovah's assertion that "there are few prison jobs available to him at SIP and other prisons which he can work and keep observing the Sabbaths." See J.A. 27 (Compl. ¶ 32) (emphasis added). However, viewing the facts in the light most favorable to Jehovah, and applying the requisite liberal construction to his pro se pleadings, Jehovah's assertion that there are few jobs available to him is not inconsistent with his having applied for and been rejected from all of those jobs. As Jehovah puts it, these other jobs are available to him "in

18

theory," but he has "plainly alleged that these jobs were made unavailable to him." Appellant's Reply Br. 14 (emphasis in original). Jehovah has alleged facts that support a plausible claim to relief. We therefore reverse the district court's dismissal of Jehovah's RLUIPA claim and remand for further proceedings.

The standard for stating a free exercise claim under the First Amendment is more stringent. Jehovah bears the burden not only of demonstrating an infringement of his religious beliefs, but also of showing that VDOC's refusal to accommodate his Sabbath work schedule is not rationally related to a legitimate penological interest. Turner, 482 U.S. at 89. Still, Jehovah's pro se civil rights complaint meets the low bar of the motion-to-dismiss stage. It is difficult to see what interest is served by making it impossible for Jehovah to perform his required work hours entirely during the week. One reasonably could determine that granting Jehovah an individual accommodation is an "obvious, easy alternative[]" that suggests VDOC's actions are unreasonable. Drawing all reasonable inferences in Jehovah's favor, he has set forth a plausible claim for relief. See Jackson, 775 F.3d at 178. Therefore, the district court erred in dismissing Jehovah's First Amendment claim.

19

## c.

The district court dismissed Jehovah's housing claims because it found that Jehovah "has no right to choose a cellmate based on that person's religious preferences or background." J.A. 57. As discussed above, however, the proper inquiry is whether and to what extent VDOC burdened Jehovah's right to exercise his sincerely held religious beliefs by assigning him cellmates who did not share his religious views.

Jehovah's RLUIPA claim must survive the motion-to-dismiss stage if he has pled facts tending to show that VDOC's refusal to accommodate his housing requests "put[] substantial pressure on [him] to modify his behavior and to violate his beliefs." Lovelace, 472 F.3d at 187 (internal quotation marks and alterations omitted). Jehovah has alleged that VDOC required him to "share a cell or anything with persons who are anti-Christian and unbelievers" in contravention of his religious beliefs. J.A. 28 (Compl. ¶ 34). This allegation alone does not demonstrate that being housed with non-Christians has pressured him to change his religious conduct. Jehovah takes issue with the exposure to non-Christians, not with any effect it has on his religious activities. As Appellees note, the few jurisdictions to address this question have found that being housed with an inmate who does not share the plaintiff's religious beliefs "does not inhibit or constrain [the p]laintiff's religious conduct." Steele v. Guilfoyle, 76 P.3d 99,

20

102 (Okla. Civ. App. 2003); see also Rogers v. Hellenbrand, No. 03-C-230-C, 2004 WL 433976, at *6 (W.D. Wis. Mar. 4, 2004) ("There is no indication in his briefs, evidence or proposed facts that simply being exposed to the religious views of others hinders [the plaintiff's] ability to exercise his own religion in any way . . . ."), aff'd, 118 F. App'x 80 (7th Cir. 2004).

In addition to his general complaints of being assigned non-Christian cellmates, however, Jehovah asserts that he was housed with a particular inmate who subjected Jehovah to "anti-Christian" rhetoric. J.A. 28 (Compl. ¶ 35). Jehovah states that he was "burdened, mocked, and harassed on account of [h]is religious views by being housed in a cell with" this inmate. J.A. 28 (Compl. ¶ 37). Construing Jehovah's pro se complaint liberally, it is reasonable to infer that Jehovah's religious practices were chilled by his cellmate's religiously motivated harassment. At the motion-to-dismiss stage, this qualifies as a sufficient prima facie showing under RLUIPA.[10] We therefore reverse the district court's dismissal of Jehovah's RLUIPA cell assignment claim.

For his First Amendment cell assignment claim to survive, Jehovah must allege sufficient facts showing that VDOC's refusal

---

[10] Since Jehovah has sufficiently pled that his housing assignments substantially burdened his religious exercise, the parties agree that remand is appropriate because the record does not establish whether VDOC's housing assignment policy is the least restrictive means of achieving a compelling government interest.

21

to assign him a different cellmate was not reasonably related to a legitimate penological interest. Turner, 482 U.S. at 89. Giving his complaint its due liberal construction, we find that he has done so. Jehovah states that his cell assignments were "deliberately done . . . to harass and cause conflict and problems for [him]." J.A. 29 (Compl. ¶¶ 38, 41 & n.18). Furthermore, he asserts that his cell assignments have contravened a SIP housing policy requiring an equivalence in cellmates' criminal and disciplinary records. J.A. 29 (Compl. ¶ 41 n. 18). He filed two grievances regarding his issues with the inmate who allegedly harassed him but never received a response.[11] J.A. 28 (Compl. ¶ 37). Given these allegations suggesting that VDOC was motivated not by a legitimate penological concern but by animus, Jehovah has successfully alleged facts supporting a plausible claim to relief. Therefore, we reverse the district court's dismissal of Jehovah's First Amendment cell assignment claim.

## IV.

A claim of deliberate indifference in violation of the Eighth Amendment requires two showings, one objective and one subjective. First, the inmate must prove that "the deprivation of a basic human

---

[11] Jehovah's residence with this inmate came to an end when Jehovah was placed in disciplinary segregation.

22

need was *objectively* sufficiently serious." De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and alterations omitted, emphasis in original). Second, she must prove that "*subjectively* the officials acted with a sufficiently culpable state of mind." Id. (internal quotation marks and alterations omitted, emphasis in original).

"Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." Id. Therefore, Jehovah must allege a serious injury or a substantial risk of such. Id. Taking the facts in the light most favorable to Jehovah, they are sufficient to support such a finding. Jehovah's alleged ailments fill two pages of his complaint and include constant chest pain, chronic headaches, and diminished hearing and eyesight. J.A. 37-38 (Compl. ¶ 69). Furthermore, Jehovah asserts that he has since been diagnosed with pulmonary hypertension with right ventricle hypertrophy, a serious and sometimes fatal condition.

Appellees do not appear to dispute that Jehovah's innumerable alleged symptoms constitute serious health issues. Rather, they focus on the subjective component of Jehovah's claim. Jehovah must show that his doctors were deliberately indifferent, or rather, that they "actually kn[e]w of and disregard[ed] an objectively serious condition, medical need, or risk of harm." De'Lonta, 330 F.3d at 634.

23

Appellees argue that Jehovah cannot meet this bar because he received extensive treatment from Dr. King and his other doctors. But the fact that Jehovah received some treatment is consistent with the allegation that his doctors ignored and failed to treat many of his symptoms. See id. at 635 (finding that the fact that the plaintiff received some treatment did not mean she received treatment for a particular ailment or that the treatment was reasonable). Jehovah has alleged that his doctors acknowledged some symptoms but ignored most, disregarded abnormal test results, and failed to treat any of his symptoms effectively. In other words, he has pled facts that, if true, would establish that his doctors "actually kn[e]w of and disregard[ed] an objectively serious condition, medical need, or risk of harm." Id. at 634. Dismissal of Jehovah's claim is not appropriate unless he has failed to present factual allegations supporting a plausible claim to relief. See Jackson, 775 F.3d at 178. That is not the case here. Therefore, the district court erred in dismissing Jehovah's Eighth Amendment claim.

**V.**

For the foregoing reasons, the judgment of the district court is

**REVERSED AND REMANDED**.

24