**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1930

PAUL TARASHUK, Personal Representative of the Estate of Paul David Tarashuk Deceased,

        Plaintiff - Appellee,

    v.

JAMIE D. GIVENS,

        Defendant - Appellant,

        and

ORANGEBURG COUNTY; ORANGEBURG COUNTY EMERGENCY MEDICAL SERVICES; DANNY RIVERS; ORANGEBURG COUNTY SHERIFF'S OFFICE; LEROY RAVENELL, Individually and in his Official Capacity as the Sheriff of the Orangeburg County Sheriffs Office; SOUTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; LEROY SMITH, Individually and in his Official Capacity as the Agency Director of the South Carolina Department of Public Safety; TOWN OF SANTEE; SANTEE POLICE DEPARTMENT; JOSEPH SERRANO, Individually and in his Official Capacity as the Chief of Police of the Town of Santee; ALISON K. B. HARMON; CLIFFORD A. DOROSKI; FRED D. RICE; BUIST M. SMITH; KEITH A. CLINE,

        Defendants.

No. 21-1931

PAUL TARASHUK, Personal Representative of the Estate of Paul David Tarashuk Deceased,

        Plaintiff - Appellee,

v.

ALISON K. B. HARMON,

           Defendant - Appellant,

    and

JAMIE D. GIVENS; ORANGEBURG COUNTY; ORANGEBURG COUNTY EMERGENCY MEDICAL SERVICES; DANNY RIVERS; ORANGEBURG COUNTY SHERIFF'S OFFICE; LEROY RAVENELL, Individually and in his Official Capacity as the Sheriff of the Orangeburg County Sheriffs Office; SOUTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; LEROY SMITH, Individually and in his Official Capacity as the Agency Director of the South Carolina Department of Public Safety; TOWN OF SANTEE; SANTEE POLICE DEPARTMENT; JOSEPH SERRANO, Individually and in his Official Capacity as the Chief of Police of the Town of Santee; CLIFFORD A. DOROSKI; FRED D. RICE; BUIST M. SMITH; KEITH A. CLINE

           Defendants.

---

Appeals from the United States District Court for the District of South Carolina, at Orangeburg.  J. Michelle Childs, District Judge.  (5:19-cv-02495-JMC)

---

Argued:  September 14, 2022                 Decided:  November 8, 2022

---

Before KING, AGEE, and THACKER, Circuit Judges.

---

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge King and Judge Agee joined.

---

**ARGUED:**  Andrew Lindemann, LINDEMANN & DAVIS, P.A., Columbia, South Carolina, for Appellants.  Jordan Christopher Calloway, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina, for Appellee. **ON BRIEF:** William H. Davidson, II, DAVIDSON, WREN & DEMASTERS, P.A., Columbia, South Carolina, for Appellant Jamie Givens.  G. Wade Cooper, BUYCK & SANDERS, LLC, Mt. Pleasant, South Carolina, for Appellant Alison KB Harmon.  Russell T. Burke, MCGOWAN, HOOD & FELDER, LLC, Columbia, South Carolina, for Appellee.

THACKER, Circuit Judge:

Appellants Jamie Givens ("Givens") and Alison Harmon ("Harmon") (collectively, "Appellants") appeal the district court's denial of their respective summary judgment motions based on a qualified immunity defense to a 42 U.S.C. § 1983 claim for damages asserted by Paul Tarashuk ("Appellee"). Appellee initiated the underlying action against Givens, Harmon, and various other South Carolina state officials after his son, 26 year old Paul David Tarashuk ("Decedent"), was struck and killed by a vehicle while he was a pedestrian on Interstate 95 ("I-95") in South Carolina.

Prior to his death, Givens, an Emergency Medical Technician ("EMT"), and Harmon, a paramedic, were called to evaluate Decedent's mental health status. Appellee alleges, inter alia, that Appellants[1] violated Decedent's Fourteenth Amendment substantive due process right to be free from deliberate indifference to his serious medical needs by failing to ensure Decedent was transported to a hospital or jail where he could receive adequate medical attention. The district court determined that, while Decedent's right to freedom from deliberate indifference to his serious medical needs was clearly established at the time of the alleged violation, a genuine dispute of material fact barred a ruling on qualified immunity at the summary judgment stage.

On appeal, Appellants contest the district court's ruling that Decedent's constitutional right was "clearly established" when it was allegedly violated in September

---

[1] Although the initial lawsuit was filed against several parties, only Givens and Harmon are the subjects of this appeal.

2018.  For the reasons set forth below, we conclude that a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to his serious medical needs was clearly established and particularly recognized by both this Circuit and the Supreme Court at the time of the events in question.  Therefore, we affirm.

## I.

"Because this is an interlocutory appeal of a denial of qualified immunity, we recount the facts as the district court viewed them -- that is, in the light most favorable to [the nonmoving party], drawing all justifiable inferences in his favor." *Hicks v. Ferreyra*, 965 F.3d 302, 305 (4th Cir. 2020).

At 18 years old, Decedent was diagnosed with schizoaffective disorder, a chronic mental health condition characterized by symptoms of hallucinations or delusions, mania, and depression.  On September 9, 2018, while traveling south on I-95, Decedent's pickup truck was run off the road near Santee, South Carolina, sometime between 9:00pm and 11:00pm.  According to the complaint, this accident caused Decedent to suffer a schizophrenic episode.  Decedent removed all his clothing and began wandering down the interstate, leaving his cell phone, wallet, clothes, and pickup truck behind in a ditch.

Decedent proceeded to run up a nearby I-95 entrance ramp toward a parked tractor-trailer truck and jump aboard the catwalk connecting the truck's cab and trailer.  After driving approximately two miles down I-95, the tractor-trailer driver realized Decedent was riding on his vehicle.  The driver placed two 911 calls seeking assistance.  During the first call, the driver told the South Carolina Highway Patrol dispatcher that a naked man had jumped onto his truck and was banging on the back of his cab.  In a second call placed

just a few minutes later, the driver reported that he had been forced to pull over because Decedent had traversed the truck's catwalk and disconnected the brake lines. Decedent then climbed on top of the cab of the truck and repeatedly tried to get inside.

When Santee Police Department officers arrived on the scene at 11:28pm, they found Decedent sitting naked atop the tractor-trailer's cab. When the officers tried to question Decedent, they received incoherent, bizarre, and inconsistent responses. For example, Decedent could not explain why he was naked and said that he was "from the skies" and wanted "to walk [his] vegetation back to the woods." J.A. 1325, 1328.[2] Decedent also either refused or was unable to state his full name and carried no identification. Eventually, Decedent's answers devolved into unintelligible gibberish.

After coaxing him down from the tractor-trailer, officers placed Decedent in handcuffs and told him that he was "detained" and would be "going . . . to jail for public and disorderly conduct." J.A. 523 (Santee Police Dep't Officer Buist A. Smith ("Smith") Body Camera Video 1 at 12:25–26, 15:09–13). Decedent then stopped talking altogether and lay down in the grass in front of the patrol car. Orangeburg County Sheriff's Office ("OCSO") Deputy Clifford A. Doroski ("Doroski") arrived on the scene at 11:32 pm. Deputy Doroski told the other officers that they should not have allowed Decedent to lie down in front of a patrol car because he could "run all over the damn interstate . . . out into traffic." Id. at 437 (Doroski Body Camera Video 1 at 5:46–6:06).

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

At approximately 12:30am on September 10, 2018, Deputy Doroski asked another officer to call for medical assistance from Orangeburg County Emergency Medical Services ("OCEMS"). The call for medical assistance was made as a Code 46, which Harmon recognized as a call for "altered mental status." J.A. 358. Likewise, Givens knew that she was responding to either "a psychiatric call" or an "altered mental status" call. *Id.* at 358, 546.

Givens, Harmon, and a trainee arrived on the scene at 1:17am. Upon arrival, Harmon spoke with Deputy Doroski, who had placed Decedent in the back of his locked police car. According to Harmon, Deputy Doroski said that Decedent had been found riding naked on top of a tractor-trailer and was unresponsive to questioning. Givens and Harmon characterized Decedent's behavior as abnormal, "weird" and "bizarre." *Id.* at 367, 372–73, 558.

Givens and Harmon escorted Decedent from Deputy Doroski's car to the ambulance. Decedent initially sat in the back of the ambulance with his head down and did not respond to questions. Givens and Harmon collected Decedent's vital signs[3] while repeatedly asking for his name. Decedent remained nonverbal throughout the encounter. Givens then retrieved an ammonia inhalant and asked Harmon if she wanted "to have the pleasure" of administering it. J.A. 439. Harmon grabbed the inhalant and inserted it up

---

[3] The district court notes that while the complaint refers to Decedent's vital signs as normal, in his response to Appellants' Motion for Summary Judgment, Appellee asserts that the South Carolina Department of Health and Environmental Control ("SCDHEC") indicated that Decedent's blood pressure of 160/82 and pulse of 124 were not within normal limits.

6

Decedent's nose, an action Harmon concedes "may not have been sanctioned by OCEMS policy." *Id.* at 330. While administering the inhalant, Givens and Harmon continued to ask Decedent for his name while suggesting that if Decedent wanted the inhalant removed, he needed to talk. Harmon stated, "If you don't want it up your nose, then talk to me." *Id.* at 568. And Givens said, "tell us your name so we can take this out your nose." *Id.* at 569. Harmon left the inhalant in Decedent's nose for six minutes in a purported effort to increase his alertness, but Decedent had no physical reaction to the inhalant and did not respond to any questions. The district court also noted, "bodycam footage of the encounter captures no instance in which [Decedent] offered a verbal response to the paramedics' questioning throughout the nearly twelve minute encounter." *Id.* at 2878.

At various points throughout the encounter, Harmon stated the following to or about Decedent:

- "Stop actin' stupid. You're a grown man." J.A. 568.

- "I know you know what the hell we're talking about. You're sittin' here laughin' and bullshittin'. . . ." *Id.* at 570.

- When an officer suggested Decedent was "full of shit," Harmon replied, "Yeah, he is." *Id.* at 571.

- "He's not a r----d" and "[w]e're not gonna sit on the side of the road all night with you . . . so what's your name?" *Id.*

Harmon also complained that Decedent was keeping her from sleeping: "I just wanna go ahead to the substation and go to sleep. So if you tell me your name, we'll let you go so I can go back to bed. . . . I'm being f---ing serious. I'm sleepy. Give me your damn name so I can [go] home for real." *Id.* at 570.

7

Givens and Harmon eventually offered Decedent the choice of going either to the hospital or to jail. When Decedent shook his head no to both options, Deputy Doroski remarked: "Then come on. I'm gonna give you a ride. You don't want to go to the hospital either, so let's go. His vitals are good ladies?" J.A. 572. Deputy Doroski then took Decedent out of the ambulance and walked him back over to his police vehicle. Givens and Harmon made no attempt to further assess Decedent's medical needs or to stop Deputy Doroski from taking Decedent. Rather, Harmon simply told Deputy Doroski and Decedent to "have a nice day" as they departed the ambulance. *Id.*

Both Givens and Harmon testified that they believed Deputy Doroski was taking Decedent either to jail or to a hospital. However, near the rear of the ambulance, in the presence of Givens and Harmon, as Deputy Doroski and Decedent were walking away, Deputy Doroski told Decedent: "You are not under arrest. I'm gonna give you a ride. . . . You are not going to jail, you are not under arrest, I'm going to give you a ride. . . . I'll figure out where you live. I'll give you a ride to a safe environment. That's all I want." J.A. 572. Deputy Doroski then told another on-scene deputy that he was taking Decedent to Santee. Ultimately, Deputy Doroski dropped Decedent off at a closed gas station in Santee around 2:00am. Decedent was wearing only a borrowed pair of red shorts and had no shoes, no wallet, no money, no cell phone, and no identification. Deputy Doroski admitted that when he left Decedent at the gas station, he had no idea of his identity, where he lived, or even whether he was mentally fit to care for himself.

Later that night, Givens filled out a pre-hospital care report classifying the call as a mental health call and marking Decedent's acuity as "lower." J.A. 552. Givens' report

8

further describes Decedent as "conscious and alert X4," a description Givens and Harmon admit was not accurate. *Id.* at 553.[4]  Indeed, a consent order signed by Givens describes Decedent as follows: "Patient was clearly in an altered mental state and incapable of making a rational, informed decision about care and unable to give consent or refuse treatment." *Id.* at 628.  The pre-hospital care report also states that Decedent refused to sign a medical release form.  However, the district court found "bodycam footage of the entire incident reveals no instance in which OCEMS personnel presented [Decedent] with any type of paperwork to sign." *Id.* at 2888.

Shortly before 6:00am on September 10, 2018, Givens's and Harmon's OCEMS crew was once again dispatched to I-95 near Santee.  When they arrived on the scene, Givens and Harmon discovered Decedent's naked body lying lifeless beside the highway.  Decedent had been struck and killed by oncoming traffic.  The pre-hospital care report for this incident confirms that Givens and Harmon had found the same man they had been called to assess earlier that night.  Indeed, while at the scene of Decedent's death, Harmon remarked "something was wrong with him[,]" and that she would have taken Decedent to the hospital had she known where Deputy Doroski was going to drop him. J.A. 619 (Smith Body Camera Video 2 at 1:18–1:21).

---

[4] "Alert x4" indicates that the patient can answer four questions:
(1) What is your name?
(2) Where are you?
(3) What time, day, month, or year is it?
(4) What happened?
J.A. 694.  Decedent was unable to answer any of those questions.  As noted, he was largely unresponsive and speaking gibberish.

Of note, Givens and Harmon were each sanctioned for misconduct relating to their treatment of Decedent by the South Carolina Department of Health and Environmental Control ("SCDHEC"), the state's EMS oversight agency. Both Givens and Harmon signed consent orders agreeing to the imposition of disciplinary sanctions.

Appellee, as the personal representative of Decedent, filed suit against Appellants pursuant to 42 U.S.C. § 1983. Appellee alleges that Appellants acted with deliberate indifference toward Decedent's known medical needs in violation of the Due Process Clause of the Fourteenth Amendment. Appellants each moved for summary judgment, contending that they were entitled to qualified immunity because Appellee failed to establish that Appellants acted with deliberate indifference to Decedent's mental health needs. Appellants also argued, in the alternative, that they were entitled to qualified immunity because the particular right allegedly violated was not clearly established.

Analyzing whether Appellants violated a clearly established right, the district court defined the right at issue as a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to their serious medical needs. The district court also identified several genuine disputes of material fact regarding whether Givens and Harmon subjectively believed Deputy Doroski intended to take Decedent to a hospital or jail where medical care would be available and whether a reasonable basis existed for that belief. Viewing the record in the light most favorable to Appellee, the district court determined that a reasonable jury could find that Givens and Harmon were deliberately indifferent to Decedent's serious medical needs. Accordingly, the district court denied Appellants' motions for summary judgment based on qualified immunity.

Appellants filed this timely appeal.

## II.

"A district court's denial of qualified immunity on summary judgment is reviewed de novo, applying the same legal standards as the district court did on summary judgment." *Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021) (quoting *Yates v. Terry*, 817 F.3d 877, 883 (4th Cir. 2016)). Generally, denials of summary judgment are interlocutory orders not subject to appellate review. *See Williams v. Strickland*, 917 F.3d 763, 767 (4th Cir. 2019). However, denials of qualified immunity can be immediately appealed under the collateral order doctrine. *See id.* at 767–68. Our jurisdiction over such interlocutory appeals is limited to the extent the denial of qualified immunity "turns on *an issue of law*." *Hicks v. Ferreyra*, 965 F.3d 302, 308 (4th Cir. 2020) (emphasis in original) (quoting *Gould v. Davis*, 165 F.3d 265, 268 (4th Cir. 1998)). Thus, we do not disturb "the district court's assessment of the record evidence" on this appeal. *Id.* (quoting *Culosi v. Bullock*, 596 F.3d 195, 201 (4th Cir. 2010)).

## III.

### A.

Pursuant to 42 U.S.C. § 1983, "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." However, the doctrine of qualified immunity shields government officials "from liability for civil damages" for the

11

deprivation of federal rights so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

Resolving questions of qualified immunity at summary judgment typically involves a two-prong inquiry: (1) whether the alleged facts, when viewed in the light most favorable to the party asserting the injury, demonstrate that the official's conduct violated a federal right; and (2) whether such right was "clearly established" at the time of the alleged violation. *Tolan*, 572 U.S. at 655–56 (quoting *Hope v. Pelzer,* 536 U.S. 730, 739 (2002)); *see also Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021). The second prong presents a "purely legal question . . . [that] is always capable of decision at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (internal quotation marks omitted). While courts can choose the order in which to engage these two prongs, "[i]f the answer to either question is no, then the official is entitled to qualified immunity." *Halcomb*, 992 F.3d at 319 (citing *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 898 (4th Cir. 2016)).

B.

We begin our analysis by determining "the precise right" at issue. *Halcomb*, 992 F.3d at 319–20 (citing *Armstrong*, 810 F.3d at 907). The right must not be defined "at a high level of generality" but with precision. *City of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015).

12

The Supreme Court has long held that "a pretrial detainee has a right to be free from any form of punishment under the Due Process Clause of the Fourteenth Amendment." *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990) (first citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); and then citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)). This right, like the Eighth Amendment right of convicted prisoners, "requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." *Id.* (citing *Martin v. Gentile*, 849 F.2d 863, 871 (4th Cir. 1988)); *see also Loe v. Armistead*, 582 F.2d 1291, 1294 (1978) ("[W]e need not decide the exact scope of the protection that due process provides [to a pretrial detainee] because we agree . . . that due process is *at least* as coextensive as the guarantees of the eighth amendment." (emphasis supplied)). Likewise, a detainee's mental health is treated just as seriously as his physical health. *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *Bowring v. Godwin*, 551 F.2d 44, 47 (4th Cir. 1977)).

Here, the district court defined the right at issue as a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to their serious medical needs. We agree. Indeed, we have repeatedly found that this exact phrasing of the right at issue is sufficiently precise. Our decision in *Scinto v. Stansberry*, 841 F.3d 219 (4th Cir. 2016), is particularly instructive. In *Scinto*, prison staff ignored pleas from a diabetic prisoner for insulin despite knowing the inmate's condition was life-threatening without insulin. *Id.* at 227–29. Prison staff asked this court to "define the right at issue" as whether it was "clearly established that a prison medical provider runs afoul of the Eighth Amendment when he does not give one single dose of insulin to a federal inmate, after the

13

inmate becomes angry and hostile . . . and the doctor implements a plan to monitor the inmate thereafter." *Id.* at 235. We rejected this highly detailed framing and instead defined the right in question as "the right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs." *Id.* at 236. In reaching this definition, we noted, "[a] prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976 and, thus, was clearly established at the time of the events in question." *Id.*

Appellants argue that we should not adhere to our precedent in *Scinto* because that decision pre-dates the Supreme Court's decisions in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018), and *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019), where the Court "admonished courts for continuing 'to define clearly established law at a high level of generality.'" Appellants' Reply Br. at 3–4 (quoting *Escondido*, 139 S. Ct. at 503). But contrary to Appellants' contention, *Kisela* and *Escondido* are not the only decisions in which the Supreme Court has "admonished" lower courts for defining clearly established law too generally, most of which pre-date *Scinto*. *See, e.g., Sheehan,* 575 U.S. at 613; *Ashcroft v. al-Kidd,* 563 U.S. 731, 742, (2011); *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (per curiam).

Moreover, neither *Kisela* nor *Escondido* addresses the precise right at issue here -- a detainee's right to adequate medical treatment. Rather, *Kisela* and *Escondido* were excessive force cases wherein the Court determined that defining the right in question as the "right to be free of excessive force" was too general where the officers' conduct did

14

not constitute an "obvious case" and the court below failed to sufficiently explain how case law prohibited the conduct in question. *See Escondido*, 139 S. Ct. at 503–04; *Kisela*, 138 S. Ct. at 1153–54. In contrast, the district court's definition here has not only been *explicitly* endorsed by this court, but as we have recognized, this definition "accords with Supreme Court jurisprudence, which has long dictated that the Eighth Amendment confers a duty upon prison officials to ensure that prisoners 'receive adequate . . . medical care.'" *Scinto*, 841 F.3d at 236 (alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1970)). Accordingly, despite urging this court to desert its ruling in *Scinto*, Appellants concede "*Scinto* is good law." Oral Argument at 9:20–29, *Tarashuk v. Givens*, No. 21-1930 (4th Cir. Sept. 14, 2022), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments.

Nonetheless, Appellants challenge the district court's characterization of the right in question and contend that the right should be defined as the "*constitutional* right to be transported by the Appellants to the hospital" and the "*constitutional* right for Appellants to intervene and prevent law enforcement from taking custody or control of [Decedent]." Appellants' Opening Br. at 6–7 (emphases in original). However, we have expressly declined to "define the rights at issue in accordance with the 'very action[s] in question.'" *Scinto*, 841 F.3d at 236 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The constitutional right in question here is appropriately defined as a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to his serious medical needs. And, here, failing to transport Decedent to a hospital and failing to ensure law enforcement transported Decedent to a hospital or jail constitute the

15

alleged ways in which Appellants violated that right. Therefore, we conclude that the district court properly defined the right at issue.

C.

Having defined the right at issue as a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to his known medical needs, we must now determine whether the law at the time of the challenged conduct was "sufficiently clear [such] that every reasonable official would understand that what he is doing violates that right." *Halcomb*, 992 F.3d at 320 (quoting *Armstrong*, 810 F.3d at 907). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks omitted).

In doing so, we first look "to cases from the Supreme Court, this Court of Appeals, or the highest court of the state in which the action arose." *Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017). In the absence of controlling authority, we then consider "whether the right was clearly established based on general constitutional principles or a consensus of persuasive authority." *Id.* (internal quotation marks omitted). However, as noted, "[t]here is no requirement that the 'very action in question [must have] previously been held unlawful' for a reasonable official to have notice that his conduct violated that right." *Scinto*, 841 F.3d 236 (second alteration in original) (quoting *Hope*, 536 U.S. at 739). Government officials "can still be on notice that their conduct violates established law even in novel factual circumstances, so long as the law provided fair warning that their conduct was wrongful." *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 418 (4th Cir. 2020) (internal quotation marks omitted); *see also Hope*, 536 U.S. at 741 (concluding that cases

16

involving "fundamentally" or "materially similar" facts are not necessary to a finding that the law is clearly established).

Here, we conclude that a reasonable official in Appellants' position would have known that their conduct -- failing to properly assess and transport an unresponsive detainee with an altered mental state either to a hospital or to jail where the detainee could obtain adequate medical attention -- could give rise to a Fourteenth Amendment violation. As mentioned above, there are a number of pre-2018 Fourth Circuit opinions that underscore the point that the right at issue was clearly established at the time of Appellants' interaction with Decedent. In *Cooper v. Dyke*, police officers ignored repeated pleas from a pretrial detainee and his friends to obtain medical attention for the detainee's gunshot wound after paramedics failed to discover the injury during their initial examination. 814 F.2d 941, 944–46 (4th Cir. 1987). The jury found the police officers liable for deliberate indifference to the detainee's serious medical needs in violation of § 1983. *Id.* at 943. On appeal, we affirmed the trial court's denial of the officers' motions for a directed verdict and judgment notwithstanding the verdict, holding that whether the police officers acted with deliberate indifference by ignoring repeated pleas for attention to detainee's gunshot wound was a question properly left to the jury. *Id.* at 946. Although we did not specifically set out to define the precise right at issue in that case, we concluded that the state of the law at the time established that "government officials who ignore indications that a prisoner's or pretrial detainee's initial medical treatment was inadequate can be liable for deliberate indifference to medical needs." *Id.* at 945.

17

In *Gordon v. Kidd*, we held that the district court properly denied an officer's motion for summary judgment on qualified immunity where the record demonstrated that the officer failed to take any action in response to information about a detainee's suicidal intention. 971 F.2d 1087, 1094 (4th Cir. 1992). In reaching this decision, we concluded, "[p]retrial detainees, like inmates under active sentence, are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs. This right is clearly established." *Id.* (citation omitted) (internal quotation marks omitted).

In *Iko v. Shreve*, this court concluded that failing to conduct a medical evaluation or decontamination after pepper-spraying an inmate during cell removal was an insufficient response to the inmate's serious medical needs. 535 F.3d 225, 242 (4th Cir. 2008). There, we defined the right at issue as "the right to adequate medical care" and affirmed the district court's denial of qualified immunity. *Id.* at 243 n.12.

Accordingly, before September 2018, it was clearly established that a pretrial detainee had a right to "at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment," *Young v. City of Mount Ranier*, 238 F.3d 567, 575 (4th Cir. 2001), and that "deliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause," *id.* (first citing *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ("Since it may suffice for Eighth Amendment liability . . . deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial."); then citing *Grayson v. Peed*, 195 F.3d. 692, 695 (4th. Cir. 1999); and then

18

citing *Belcher*, 898 F.2d at 34 ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee.")); *see also Buffington v. Baltimore County*, 913 F.2d 113, 119 (4th Cir. 1990) ("Such duties have been found both where the state takes custody incident to enforcement of its criminal laws, and where the custody serves civil, regulatory purposes.").

While there is no controlling authority dealing with the precise facts at issue here, our Circuit's case law gave Appellants "fair warning" that disregarding a substantial risk of serious injury to the detainee or knowing of and ignoring a detainee's serious need for medical care violates the due process clause. *See, e.g.*, *Young*, 238 F.3d at 575–76 ("Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care."); *Cooper*, 814 F.2d at 945 ("[G]overnment officials who ignore indications that a prisoner's or pretrial detainee's initial medical treatment was inadequate can be liable for deliberate indifference to medical needs."); *White ex rel. White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997) ("A claim of deliberate indifference . . . implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice."). Our precedent also gave Appellants "fair warning" that providing "some treatment does not mean they have provided *constitutionally adequate* treatment." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 211 (4th Cir. 2017) (emphasis in original) (internal quotation marks omitted); *see also Jehovah v. Clarke*, 798 F.3d 169, 181–82 (4th Cir. 2015) (finding that a

failure to treat an inmate's known symptoms effectively would establish that doctors "actually kn[e]w of and disregard[ed] an objectively serious condition, medical need, or risk of harm." (alterations in original) (internal quotation marks omitted)).

Thus, the fact that we have not yet considered a case where EMTs or paramedics engaged in the exact same conduct as Appellants did here does not absolve Appellants of liability. A reasonable EMT or paramedic in Appellants' position clearly would have known that a government official may be subject to a claim of deliberate indifference for failure to provide adequate medical care to a mentally ill detainee. Likewise, a reasonable EMT or paramedic in Appellants' position would have known that their conduct was not only unlawful but also created a substantial risk of serious harm to both the detainee and those he may have encountered. Therefore, we conclude that at the time of the alleged violation, it was clearly established that a pretrial detainee has a right to be free from deliberate indifference to his serious medical needs and failing to ensure the detainee is transported to someplace where he can receive adequate medical care for those needs violates this constitutional right. *See Scinto*, 841 F.3d at 236; *Cooper*, 814 F.2d at 943–45; *Buffington*, 913 F.2d at 119; *Gordon*, 971 F.2d at 1094; *White*, 112 F.3d at 737; *Young*, 238 F.3d at 575–76; *Iko*, 535 F.3d at 242; *Jehovah*, 798 F.3d at 181–82; *Heyer*, 849 F.3d at 211; *see also De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) (finding the fact that a prisoner received some treatment did not mean she received treatment that was adequate to address her serious medical need).

20

D.

Finally, we address Appellants' argument that Decedent was not a pretrial detainee as a matter of law. Crucially, Appellants raise this argument for the first time on appeal. At no point during the proceedings below did Appellants argue or even suggest that Decedent was not to be treated as a pretrial detainee. In fact, Harmon *conceded* this point in her motion for summary judgment:

> As a threshold matter, the evidence would show that, at the time that [OCEMS] and Defendant Harmon encountered [Decedent], he had been detained by law enforcement. Although not in handcuffs, he had been placed in an Orangeburg County Sheriff's Department vehicle and did not appear free to leave . . . . **As he was a pre-trial detainee** at the time he was examined by Harmon, Plaintiff's deliberate indifference claim against Harmon should be examined under the Due Process clause of the Fourteenth Amendment.

J.A. 328 (emphasis supplied). Givens also did not raise this issue below and conceded in her signed SCDHEC Consent Order that Decedent was "in the custody of a sheriff from the OCSO" when she arrived on the scene. *Id.* at 624.

"It is well established that this court does not consider issues raised for the first time on appeal, absent exceptional circumstances." *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020) (internal quotation marks omitted) (quoting *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 242 (4th Cir. 2009)). "When a party in a civil case . . . raises [an argument] for the first time before us, we may reverse only if the newly raised argument establishes 'fundamental error' or a denial of fundamental justice." *In re Under Seal*, 749 F.3d 276, 285 (4th Cir. 2014) (quoting *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir.

21

1985)).  "[T]he burden is on the party who has failed to preserve an argument to show that [this] standard is met." *Id.* at 292.

Here, Appellants have not pointed to any "exceptional circumstances" necessitating our review of this issue for the first time, and there is nothing in the record that demonstrates "a reason sufficient to clear this 'high[] bar.'" *Williams v. Kincaid*, 45 F.4th 759, 776 (4th. Cir. 2022) (alteration in original) (quoting *Hicks*, 965 F.3d at 310). Appellants have also not addressed our "fundamental error" standard, nor have they attempted to show that they can meet it here.  For that reason alone, Appellants have not satisfied their burden of identifying a "fundamental error" warranting reversal on a ground not raised before the district court.  *Under Seal*, 749 F.3d at 292.  Thus, we do not entertain Appellants' argument regarding Decedent's status as a pretrial detainee.  That is an issue for the district court to consider in the first instance.

## IV.

For the foregoing reasons, the district court's order denying summary judgment is

*AFFIRMED.*

22